NOT RECOMMENDED FOR PUBLICATION
File Name: 15a0327n.06

No. 14-5777

FILED
May 05, 2015
DEBORAH S. HUNT, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| SHELLEY BROWN, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| FEDERAL EXPRESS CORPORATION; | ) | UNITED STATES DISTRICT |
| FEDERAL EXPRESS CORPORATION SHORT | ) | COURT FOR THE |
| TERM DISABILITY PLAN; FEDERAL | ) | WESTERN DISTRICT OF |
| EXPRESS CORPORATION LONG TERM | ) | TENNESSEE |
| DISABILITY PLAN, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

BEFORE:    SILER, BATCHELDER, and ROGERS, Circuit Judges

**ALICE M. BATCHELDER, Circuit Judge.**    This Employee Retirement Income Security Act ("ERISA") case stems from a denial of disability benefits by employer Federal Express Corporation ("FedEx").    Plaintiff Shelley Brown, a FedEx employee, applied for disability benefits, contending that several doctors had diagnosed her with Lyme disease and thyroiditis.    FedEx, and its claims-paying administrator Aetna Life Insurance Company ("Aetna"), denied her request for benefits, due to the contradiction between negative lab results and her doctors' diagnoses.    Brown challenged FedEx's determination in federal district court. The district court held that FedEx's denial of benefits was not arbitrary and capricious.    Finding no error in the district court's determination, we AFFIRM.

**I.**

FedEx established its Short Term Disability ("STD") Plan to provide for the payment of short-term disability benefits for its employees. [R. 10-8 at ID# 629] FedEx acts as the administrator of the plan. [*Id.* at 630] The plan designates Aetna as its claims-paying administrator. [R. 10-7 at 528] It further provides that "[u]pon receipt by the Claims Paying Administrator of proof that a Covered Employee has incurred a Disability, such Covered Employee shall be entitled to receive a Disability Benefit subject to the limitations and conditions set forth herein." [R. 10-8 at 640]

The plan requires that a disability be "substantiated by significant objective findings which are defined as signs which are noted on a test or medical exam and which are considered significant anatomical, physiological or psychological abnormalities which can be observed apart from the individual's symptoms." [R. 10-8 at 631-32] It specifically states in bold-face type: "It is important to remember pain alone is not proof of disability." [R. 10-7 at 533] The burden of proof for establishing a disability is on the employee. [R. 10-8 at 652] If Aetna determines that the employee cannot substantiate his disability, "such Employee may be required to submit himself to an examination by a Practitioner selected by [Aetna]." [*Id.*]

Shelley Brown was a senior strategic sales specialist with FedEx from 2005 to 2012. [R. 10-5 at 300] Among other job responsibilities, a senior strategic sales specialist uses "advanced business analysis skills, computer modeling techniques, database tools and/or approaches to develop innovative, high quality, and/or customer centric results." [*Id.*] Brown claimed disability benefits under FedEx's STD plan beginning on February 8, 2012. [R. 10-2 at 56] Prior to that date, she visited a doctor at least once, on January 20, 2012, claiming pelvic pain,

back pain, swollen lymph nodes, and urination difficulty. [R. 10-4 at 234] The treating doctor detected no abnormalities at that time. [*Id.*]

On March 29, 2012, Brown visited Dr. Wallace of The Family Physicians Group to discuss the possibility of her having Lyme disease. [*Id.* at 262] Dr. Wallace drafted an Attending Physician Statement a few days later in which he said that Brown was unable to work in any capacity until April 30, 2012. [*Id.* at 261] His diagnosis, however, was not Lyme disease but fibromyalgia and post-partum depression. [*Id.*]

Meanwhile, Aetna had referred Brown's claim to Dr. Wendy Weinstein. [*Id.* at 279] Dr. Weinstein prepared a report and noted no abnormalities in Brown's record. [R. 10-5 at 282] In the report, she recounted a conversation she had had with Dr. Wallace:

> [Dr. Wallace] indicated that [Brown] was insistent that something was wrong with her but he noted a thorough evaluation had been done and there was no documentation of an underlying diagnosis other than her depression and increased emotionality . . . . He indicated that all of the studies he checked were normal and he had no explanation for her symptoms. He noted that she told him that one of the specialists had indicated she had Hashimoto's thyroiditis. However, Dr. Wallace said he had checked her TSH and free T4 and they were normal and he had no indication that this was a real diagnosis.

[*Id.* at 283] Dr. Weinstein further reported Dr. Wallace's saying that "he gave the claimant time off work based on her request and her concerns that there was really something wrong with her other than depression and fibromyalgia." [*Id.*] Based on this information, Dr. Weinstein concluded:

> The presented clinical information fails to support functional impairments from the claimant's sedentary occupation from 2/8/12 forward. The claimant has had multiple evaluations by multiple providers for subjective complaints. However, the records have not documented specific physical examination abnormalities or underlying abnormal diagnostic studies that would support functional impairments from sedentary work.

[*Id.*]. She recommended that Aetna deny Brown's claim. [*Id.*]

On April 13, 2012, Brown visited Dr. Callaghan in order to be tested for Lyme disease. [R. 10-2 at 82] The test came back negative under all standards. [*Id.* at 82-83] That being said, Dr. Callaghan wrote on Brown's test results: "Although a negative test, having 2 positive and 3 indeterminate bands plus your multitude of symptoms causes me to diagnose you with 'clinical lyme disease.'" [*Id.* at 82] Further, because of a different test which revealed high thyroglobulin levels, Dr. Callaghan also diagnosed Brown with Hashimoto's thyroiditis which, in his words, could, "on any given day," cause "hypo or hyperthyroid symptoms [including] sick like fatigue, memory loss and muscle aches." [R. 10-4 at 263] A few days later, he wrote a letter to Aetna, which was still reviewing Brown's case. In it, he noted that "Shelley Brown has come to me with multiple complaints including extreme fatigue, multiple joint pains…frequent nausea, tremors, heart palpitations, severe headaches and insomnia." [R. 10-2 at 92] After seeing her on April 13, he wrote, he had determined "she also has autoimmune thyroiditis and is very likely to have lyme disease based on my clinical impressions." [*Id.*] He concluded that he has found "this patient to be quite ill and unable to work due to all of the above issues." [*Id.*]

Brown submitted to Aetna the information about her visit with Dr. Callaghan, as well as the test results. [R. 10-5 at 285] Dr. Weinstein reviewed all of the relevant additional material and supplemented her initial report with an addendum on May 14, 2012. [*Id.* at 286] As to Brown's supposed thyroiditis, Dr. Weinstein noted:

> The claimant's laboratory studies have documented normal thyroid-stimulating hormone levels with no indication of hyperthyroidism or hypothyroidism. Additional testing noted an increased thyroglobulin level and the physician wrote on the note that the claimant had Hashimoto thyroiditis which could cause her altering symptoms of being hyperthyroid or hypothyroid and it was noted she could have symptoms of fatigue, memory loss, and muscle aches related to these findings. Next to claimant's cortisol result, the provider wrote, "You must be exhausted." Once again, this is reference to the claimant's subjective complaint which the physician assumed she would have based on this laboratory finding.

[*Id.* at 286-87]  As to Brown's supposed Lyme disease, Dr. Weinstein stated that "[a] note next to the claimant's Lyme titers stated that although she had a negative test, the findings would cause her to have a diagnosis of 'clinical Lyme disease.'"  [*Id.* at 287]  Rejecting this diagnosis, Dr. Weinstein concluded that the records "do not document physical examination abnormalities and the submitted laboratory studies do not document significant findings that would support functional impairments from the claimant's sedentary occupation as well."  [*Id.*]

On May 24, 2012, based on Dr. Weinstein's report and an independent review of the various documents, Aetna denied Brown short-term disability benefits.  [R. 10-2 at 56]  The denial letter specifically noted that "Dr. Callahan [sic] submitted a letter that indicates you are incapable of working related to possible autoimmune thyroiditis and most likely Lyme disease, however, no abnormal examinations or neurological or musculoskeletal findings were documented or submitted."  [*Id.* at 57]

Upon hearing this news, Brown returned to Dr. Callaghan on May 26, 2012, for another round of testing for Lyme disease.  [*Id.* at 96]  This test also returned negative results.  [*Id.*]  On the results, however, Dr. Callaghan again noted: "Your tests are negative but again having several lyme bands positive and intermediate raises the suspicion of lyme.  With your clinical picture I still consider you have probable 'clinical lyme disease.'"  [*Id.*]

On June 28, 2012, Brown visited Dr. Crist in order to be tested for Lyme disease one more time.  [R. 10-3 at 157]  This time, one of the tests came back positive.  [*Id.*]  This particular Lyme test examines both the IgM and IgG antibody blots.  [*Id.* at 157-58]  Each blot returns a result under the standards of both IGeneX (the company that produces the test) and the Centers for Disease Control and Prevention ("CDC").  [*Id.*]  Brown's results yielded a positive IGeneX

IgM result, but a negative result under the other three standards (the CDC IgM standard and both

IgG standards).

Armed with the new test results and opinion letters from Drs. Callaghan and Crist, Brown

appealed Aetna's decision on November 19, 2012. [R. 10-2 at 59] Aetna referred the appeal to

Dr. Steven Swersie for peer review. [R. 10-5 at 289] Dr. Swersie reviewed all the

documentation, including the new lab results, the opinion letters, and Dr. Weinstein's reports.

Noting that Brown had complained of a vast array of symptoms, he concluded: "I will not

attempt to list those [symptoms] indicated and will limit my review to those notations made by

her providers, as well as the results of objective diagnostic tests." [*Id.* at 291] Dr. Swersie's

ultimate conclusion was that Brown's case "is characterized by multiple subjective complaints

from the claimant with minimal objective findings. Unfortunately, she also had a multitude of

laboratory tests performed, several with obvious misinterpretations by her providers with this

misinterpretation conveyed to the claimant, only reinforcing her subjective symptoms." [*Id.* at

294] He specifically rejected both the thyroiditis and Lyme disease diagnoses. As to thyroiditis,

he stated:

> [H]er provider indicated the elevated thyroglobulin level indicated chronic thyroiditis when this result may be seen with any type of thyroid enlargement or even in some normal circumstances. Her anti-peroxidase antibody level, on the other hand, was not elevated and significant elevation of this test is used to diagnose chronic thyroiditis or Hashimoto's thyroiditis in the absence of an actual thyroid biopsy. There is therefore, based on the laboratory tests reported, no evidence to support a diagnosis of Hashimoto's thyroiditis in this claimant.

[*Id.*] As to Lyme disease, he noted that "[t]he diagnosis of Lyme disease, either in the past or

recently, was not documented by the laboratory tests I reviewed with antibodies to both IgG and

IgM being negative." [*Id.*]

Based on Dr. Swersie's report and an independent review of the documentation, Aetna upheld the denial of short-term disability benefits on February 8, 2013. [R. 10-1 at 48] The letter concluded that the committee "considered all submitted documentation, noted the conclusions of peer physicians, and determined there are no significant objective findings to substantiate that a functional impairment exists that would render your client unable to perform her sedentary job duties." [*Id.* at 50] Specific to Lyme disease, the letter from Aetna noted:

> Although your client has reported back and leg pain, fatigue and abdominal pain and her providers are of the opinion she has clinical Lyme disease, there are no objective findings that support a functional impairment such as diagnostic sensory testing revealing neurological deficits or formal cognitive testing that reveals impairment in concentration or thinking.

[*Id.*] This concluded the appeals process for Brown's claim.

In June 2013, Brown filed a complaint in federal district court against FedEx, the FedEx Short Term Disability Plan, and the FedEx Long Term Disability Plan.[1] [R. 1]. She sought a remedy under ERISA, specifically 29 U.S.C. § 1132(a)(1)(B), which allows a civil action to be brought "to recover benefits due to [a beneficiary] under the terms of his plan." On February 18, 2014, the defendants filed a motion for summary judgment. [R. 20] The district court granted the motion for summary judgment on May 28, 2014. [R. 25] Brown timely appealed to this court.

---

[1]Although the Long Term Disability Plan is technically a party in this appeal, Brown has waived any arguments against it. As a preliminary matter, Brown was not even eligible for long-term benefits. The STD Plan provides benefits from the point of proof of disability for a maximum of twenty-six weeks. [R. 10-5 at 295-96] The Long Term Disability Plan, on the other hand, commences "following the conclusion of all benefits payable to the Disabled Covered Employee pursuant to the Federal Express Corporation STD Plan on account of the same condition." [*Id.* at 296] Because Brown never received short-term benefits, she would not have been eligible for long-term benefits. Either way, the district court explicitly held that the denial of long-term benefits was not arbitrary and capricious. As FedEx points out, there is only a passing reference to Brown's long-term benefits claim in her statement of facts, but no actual argument about the district court's decision in that regard. Any argument about the long-term plan, therefore, is waived because, as we have frequently observed, "[a]n appellant waives an issue when he fails to present it in his initial briefs." *Marks v. Newcourt Credit Grp., Inc.*, 342 F.3d 444, 462 (6th Cir. 2003).

**II.**

We review de novo denials of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) unless, as here [*see* R. 10-8 at 657], "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1063 (6th Cir. 2014) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). "If a plan affords such discretion to an administrator or fiduciary, we review the denial of benefits only to determine if it was 'arbitrary and capricious.'" *Marks v. Newcourt Credit Grp., Inc.*, 342 F.3d 444, 456 (6th Cir. 2003). Put another way, on appeal, "we review *de novo* the district court's finding that the administrator's denial was not arbitrary and capricious." *McClain*, 740 F.3d at 1064.

The "arbitrary and capricious" standard "is the least demanding form of judicial review of administrative action . . . . When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious." *Perry v. United Food & Commercial Workers Distrib. Unions 405 & 422*, 64 F.3d 238, 242 (6th Cir. 1995) (citations and internal quotation marks omitted). The standard requires that the decision "be upheld if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991). Although this extremely deferential standard is "not without some teeth, it is not all teeth. An 'extremely deferential review,' to be true to its purpose, must actually honor an 'extreme' level of 'deference' to the administrative decision." *McClain*, 740 F.3d at 1064.

**A.**

Brown's first contention is that FedEx acted arbitrarily and capriciously by rejecting the opinions of three treating sources as to her disability. The district court held that "[b]ecause her physicians' diagnoses were based on the combination of Plaintiff's subjective reporting of her symptoms, two negative lab tests, and one positive but questionable lab test, the Court finds that Aetna's conclusion that this evidence failed to adequately substantiate Plaintiff's alleged disability was not arbitrary and capricious." [R. 25 at 1110]. We find no error in this determination.

The STD plan conditions benefits on "significant objective findings" substantiating the claimed disability. The plan defines "significant objective findings" as "signs which are noted on a test or medical exam and which are considered significant anatomical, physiological or psychological abnormalities which can be observed apart from the individual's symptoms." [R. 10-8 at 631-32] The plan does not say what makes a finding or a physiological abnormality "significant"; it gives the administrator discretion to interpret "significant" and all other terms in the plan. [*Id.* at 657] This court, therefore, must defer to Aetna's interpretation of the STD plan so long as that interpretation is neither arbitrary nor capricious. *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 660 (6th Cir. 2004).

Turning first to her alleged Lyme disease, Brown contends that three different doctors considered her disabled and so Aetna was arbitrary and capricious by denying her benefits. Aetna, however, did not act arbitrarily and capriciously in concluding that the opinions of Dr. Wallace, Dr. Callaghan, and Dr. Crist did not establish—or were not based on—"significant objective findings." With respect to Dr. Wallace, none of the objective evaluative measures employed by him revealed any abnormalities. [R. 10-5 at 282-83] Dr. Wallace even told Dr.

Weinstein that he had no diagnosis to explain Brown's subjective complaints and had only given her "time off work based on her request and her concerns that there was really something wrong with her other than depression and fibromyalgia." [*Id.* at 283] His opinion, therefore, was in no way supported by "significant objective findings."

With respect to Dr. Callaghan, his diagnosis also did not rest on "significant objective findings." As he explained to Brown, his diagnosis was predicated on two considerations: (1) Brown's "multitude of symptoms"; and (2) the indeterminacy of the results of Brown's blood tests. [R. 10-2 at 82] Aetna was not obligated to credit the first consideration, since the STD plan clearly states that observable symptoms may not be the basis for a finding of disability. As to the second consideration, Aetna could rationally conclude that indeterminate results are not the same thing as "significant objective findings." It may be true, as Brown argues, that irregularities in her blood test results indicated some "physiological abnormalities." But coverage under the STD plan requires "*significant* physiological abnormalities." The fact that both sets of Brown's test results were uniformly negative for Lyme disease might reasonably be understood to mean that the test results were not significant.

With respect to Dr. Crist, his diagnosis was apparently based on the results of the blood test he ordered for Brown in June 2012. Dr. Crist ordered that Brown's blood be tested for Lyme disease using two methods: the IgG Western Blot test and the IgM Western Blot test. The lab that conducted the testing, in turn, provided results under each of two standards: the CDC standard and the lab's standard. The IgG Western Blot test came back negative under both the CDC standard and the testing lab's standard. [R. 10-3 at 158] The IgM Western Blot test also came back negative under the CDC standard, but came back positive under the testing lab's standard. [*Id.* at 157] Aetna could reasonably determine that those mixed results did not

constitute "significant objective findings." Under three of the four measures, including both CDC measures, Brown was negative for Lyme disease—results consistent with every one of the tests ordered by Dr. Callaghan.[2] Against that evidence, just a single measure indicated that Brown had Lyme disease. The weight of the evidence, then, pointed decisively against Brown's having Lyme disease, and militated against giving too much credence to the lone result suggesting otherwise. Thus, Aetna could reasonably conclude that the results of the test ordered by Dr. Crist were not "*significant* objective findings."

Further, FedEx was not arbitrary and capricious in relying on the opinions of Drs. Weinstein and Swersie—who did not examine Brown—over her examining doctors. Although the Plan *allowed* FedEx to require its employee to submit to a physical examination, it did not mandate that a physical examination be performed. "[T]he failure to conduct a physical examination—especially where the right to do so is specifically reserved in the plan—may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005). But "reliance on a file review does not, standing alone, require the conclusion that [a plan administrator] acted improperly." *Id.* "[W]hen a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits," this decision "cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003). It does not matter that this choice is between a non-treating and a treating physician. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003) (holding that "plan administrators are not

---

[2]Brown contends that use of the CDC standards is inappropriate because the CDC standards were not entered into the administrative record. But Brown's results under the CDC standards are indeed in the record.

obliged to accord special deference to the opinions of treating physicians"). FedEx was not arbitrary and capricious, therefore, in according more weight to Aetna's peer-review physicians.

As for Brown's alleged Hashimoto's thyroiditis, the only objective evidence that she had this disorder was from Dr. Callaghan, who diagnosed her with the disease after a test revealed high thyroglobulin levels. [R. 10-4 at 263] Dr. Wallace, however, tested Brown for thyroiditis because she had told him that another specialist had diagnosed her with the disease, and he found that her levels were "normal and he had no indication that this was a real diagnosis." [R. 10-5 at 283] Further, Dr. Swersie criticized Dr. Callaghan's methodology. He noted that although Brown had high thyroglobulin levels, that can happen with "any type of thyroid enlargement or even in some normal circumstances." [*Id.* at 294] In fact, he noted that the more relevant measurement level for determining thyroiditis was "not elevated." [*Id.*] Given the legitimate criticism of Dr. Callaghan's scientific methodology, it was not arbitrary and capricious for FedEx to determine that Brown was not disabled with thyroiditis. Even if it were, however, there is an uncontroverted statement from Dr. Weinstein in the record that a diagnosis of thyroiditis "in and of itself would not preclude the claimant from performing her sedentary occupation." [*Id.* at 284] Because FedEx's decision to deny benefits because of a lack of objective evidence of Lyme disease was not arbitrary and capricious, even a diagnosis of thyroiditis would not entitle Brown to benefits.

**B.**

Brown's second contention on appeal is that FedEx acted arbitrarily by "denying her disability benefits while refusing to allow her to bring her prescribed intravenous antibiotics into the workplace." [Brown Br. 17] Sometime around May 2012, Dr. Callaghan placed Brown on an intravenous antibiotic regimen to treat what he had diagnosed as Lyme disease. [*See* R. 10-1

at 49] According to Brown, this regimen involved infusing intravenous antibiotics three times a day. [R. 10-2 at 72] Brown submitted into the administrative record an unsworn statement detailing FedEx's alleged treatment of her as she attempted to return to work following her diagnosis. According to this statement, she received a letter from FedEx notifying her of the denial of benefits and mandating that she return to work on June 4, 2012. [*Id.*] Not wanting to lose her job, she enlisted the aid of her fiancé to help her bring her medical supplies into the office. [*Id.*] She informed her supervisor via text message that she was coming into work with her medical supplies. [*Id.* at 73] When she arrived, her supervisor was blocking the entrance to her cubical and demanded that Brown follow her to the supervisor's office. [*Id.*] During a subsequent meeting, Brown alleges that various FedEx employees told her that, according to FedEx policy, she could not bring any medical supplies to work and so she had to leave the premises. [*Id.*] She left the premises and was eventually terminated. [*Id.* at 74] She characterized the entire experience as "intensely dehumanizing and considerably humiliating." [*Id.*] Her fiancé also submitted into the administrative record an unsworn statement which corroborated all the major details of Brown's story. [*See id.* at 75]

Other than noting that Dr. Callaghan prescribed intravenous antibiotics for Brown, there is scant mention of the antibiotics in the administrative record. The only mention of it in the final Aetna report is the terse statement that "[w]hile it is recognized your client was prescribed I.V. antibiotics to be self-administered three times a day, there is nothing in the submitted documentation that indicates the schedule of administration could not be done around a work schedule so this would not interfere with your client's ability to work." [R. 10-1 at 50] Brown contends that this statement is "entirely contrary" to her own testimony, and thus arbitrary and capricious. [Brown Br. 18]

As an initial matter, "the ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *McClain*, 740 F.3d at 1066 (quoting *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002)). The argument as formulated by Brown—that FedEx acted arbitrarily and capriciously by denying Brown disability benefits while refusing to allow her to bring her antibiotics into the workplace—is thus a red herring. FedEx had already denied Brown disability benefits by the time the events alleged in Brown's statement occurred. Even if unsworn statements from the allegedly disabled employee could establish objective evidence of disability, Brown's statements document an event that took place after the denial of benefits. Her allegations might have been better suited for an Americans with Disabilities Act claim, which she did not bring here.

Brown's argument might be styled as one contending that FedEx acted arbitrarily and capriciously by denying her benefits because the intravenous antibiotic program by itself was objective evidence of disability. This, however, improperly shifts the burden of proof to FedEx. Brown, as the claimant, had the burden of proving disability through the entire claim process. She submitted into the record no objective evidence that would contradict Aetna's conclusion that the regimen could be compatible with her work schedule. Because she did not meet her burden of proof, therefore, FedEx's decision to deny benefits despite the intravenous antibiotic regime was not arbitrary and capricious.

## III.

For the foregoing reasons, we AFFIRM the judgment of the district court.