382 S.E.2d 502

**Iris MARTIN, Admx.**

v.

**CHARLESTON AREA MEDICAL CTR., et al.**

No. 18342.

Supreme Court of Appeals of West Virginia.

March 9, 1989.

Rehearing Denied July 20, 1989.

---

Barry M. Hill, Zagula, Hill & Dittmar, Weirton, for appellant.

John F. Wood, Jr., DEE–Ann Burdette, Wood, Grimm & Delp, Huntington, for appellees.

NEELY, Justice:

In January, 1981 Milas Martin was a regularly employed, black factory worker at the South Charleston Volkswagen plant. He was married to his second wife and had a son and two daughters by that union, plus a daughter by a first marriage. Mr. Martin died as the result of a diagnostic procedure at the Charleston Area Medical Center (C.A.M.C.). The only issue in this case is whether the jury's verdict of $250,-000 for wrongful death in this medical malpractice case is inadequate under the standards of *Freshwater v. Booth*, 160 W.Va. 156, 233 S.E.2d 312 (1977). We find that it is and reverse the judgment of the circuit court.

Milas Martin visited the office of defendant Edward G. Lewis, M.D., a general practitioner, with classic symptoms of diabetes mellitus. When he visited Dr. Lewis, Mr. Martin brought a statement from his employer showing that elevated blood pressure readings had been taken several months earlier. Dr. Lewis sent Mr. Martin to the Charleston Area Medical Center for various tests, one of which was an intravenous pyelogram (known as an IVP). An IVP is a diagnostic x-ray series that requires the injection of a contrast medium, often referred to as dye, for enhancement of the x-rays. In Mr. Martin's case, the purpose of the IVP was to determine whether there was a renal problem causing or contributing to Mr. Martin's high blood pressure.

Mr. Martin was taken to the radiology department of C.A.M.C. where the IVP was performed under the direction of defendant J.L. Leef, M.D., a radiologist. At the time the IVP was performed, Mr. Martin's hospital chart showed that his primary health problem was uncontrolled diabetes and that no treatment for diabetes had been undertaken. Soon after the dye injection, Mr. Martin had an acute anaphylactoid reaction to the dye. Dr. Leef attended Mr. Martin during the reaction and was soon joined by

C.A.M.C.'s emergency team, headed by defendant Dr. Duane Kuhlenschmidt, a resident physician employed by C.A.M.C. Mr. Martin died on the x-ray table from the reaction to the dye injection.

Suit was brought against the doctors involved in the case and the Charleston Area Medical Center on a number of theories, the most prominent of which was lack of informed consent. The uncontradicted evidence demonstrated that Dr. Leef did not inform Mr. Martin that there was some likelihood of a fatal reaction to an IVP. The experts disagreed, however, about the exact extent of the risk. As an alternative theory, plaintiff maintained that because of the high degree of risk from the IVP procedure to a person in Mr. Martin's profile, Dr. Lewis should not have ordered the test, and Dr. Leef should not have performed it. Furthermore, even if after careful deliberation the test had been deemed essential, both Dr. Lewis and Dr. Leef should have delayed performing the test at least until Mr. Martin's diabetes was brought under control. Finally, plaintiff maintained that Dr. Leef and Dr. Kuhlenschmidt were negligent in their resuscitation efforts.

Expert testimony was presented at trial to support all of these theories of negligence and the defendants presented expert testimony in their defense. The most important aspect of the defendants' case, however, was substantial evidence of contributory negligence on Mr. Martin's part. In this regard, the defendant proved that Mr. Martin did not give Dr. Leef's radiology technician an accurate personal health history. It is the defendants' contention that if Mr. Martin had given an accurate health history, the IVP would definitely not have been performed.

Mr. Martin was evaluated in 1973 at the Veterans Administration Hospital in Huntington and diagnosed as having angina pectoris. In November, 1976, Mr. Martin was diagnosed as having asthma and bronchitis. Mr. Martin had been treated for chest pains and hypertension, and on 29 August 1978, he had a reaction to the high blood pressure medicine he was taking. Furthermore, on 12 September 1978, Mr. Martin had an allergic reaction to a tetanus booster. All of this information, defendants maintain, would have caused them to avoid an IVP.

The plaintiff presented evidence that Mr. Martin was a regularly employed worker at an hourly wage of $11.20 in 1980. By the time of trial, wages had risen to $13.00 per hour in Mr. Martin's job description. There was evidence that Mr. Martin's historical, average work year was 2400 hours, a figure that included roughly five hours of overtime per week. The plaintiffs presented the expert testimony of John Burke, Ph.D., whose opinion it was that the present value of past and future economic loss to the Martin family, after reducing the gross amount by 35 percent for Mr. Martin's personal consumption, was at the time of trial: (1) $768,000 if Mr. Martin worked to age 59; and, (2) $865,000 if Mr. Martin worked to age 65. Dr. Burke concluded that the plaintiff's economic loss was somewhere between those two figures.

The defendants did not produce their own expert on economic loss, but they did produce testimony from a pathologist who performed an autopsy on Mr. Martin tending to prove that Mr. Martin would not have lived a normal span of years. The pathologist stated that the autopsy revealed severe narrowing of two of the four coronary arteries and he opined:

"Personally speaking, this man would have been a candidate for sudden, unexpected death at any point in time."

However, the pathologist conceded that persons with severe coronary artery narrowing can live full, vigorous lives.

Special interrogatories were given to the jury, which found in favor of the plaintiff, but assessed 40 percent contributory negligence against the plaintiff's decedent. The jury found Dr. Leef 15 percent negligent, Dr. Lewis 30 percent negligent, and Dr. Kuhlenschmidt 15 percent negligent. As indicated above, they then assessed all damages at $250,000. It was left, then, to the court to reduce this gross award by 40 percent *for Mr. Martin's share of the negligence.*

We believe that had the jury's verdict for $250,000 been for economic loss alone, it would not have been contrary to the weight of the evidence. However, when we take into consideration that the plaintiff, in her representative capacity, was also suing for non-economic loss, specifically for loss of a father and loss of a husband, we find that the verdict is inadequate.

The leading case in this jurisdiction on inadequate jury verdicts is *Freshwater v. Booth, supra,* where we discussed four profiles of inadequate jury verdicts. We believe that this case is a "Type 2" case under the *Freshwater* typology. In *Freshwater,* we explained a "Type 2" case as follows:

> The second type of case is one where liability is strongly contested and the award of damages is clearly inadequate if liability were proven.... In this situation an appellate court cannot infer from the jury verdict alone whether the jury were confused about the proper measure of damages or whether they were confused about the proper rules for determining liability, or both. These cases represent an extreme example of the compromise verdict which in its less oppressive form has historically been rejected in theory by all appellate courts, yet accepted in practice by almost every bar and bench.
>
> Appellate courts are not so naive as to believe that juries can operate like law professors and segregate the circumstances of liability and the degree of moral fault which those circumstances imply from the proper measure of damages for the victims. [footnote omitted] A jury award for pain and suffering is an inherently subjective undertaking, and the degree of moral fault which a jury imputes to the tortfeasor is almost inevitably reflected in the liberality or parsimony of the pain and suffering award. Nevertheless, subjective though pain and suffering awards may be, the jury must give some reasonable compensation for pain and suffering to victims when such pain and suffering have been demonstrated, and an award which is so unreasonable that its adequacy cannot be de-

bated by fair-minded men must be set aside. Where, however, liability is contested and an appellate court is unable to infer whether upon a new trial a jury would find in favor of the defendant or in favor of the plaintiff an appellate court must remand the case for a trial on all issues.

160 W.Va. at 160–62, 233 S.E.2d 312.

In the case before us the defendants could have prevailed entirely on their contributory negligence theory; however, the defendants were unable to adduce any evidence to a reasonable degree of medical certainty proving the exact dimensions of Mr. Martin's lowered life expectancy. The defendants did demonstrate that Dr. Burke's calculation of economic loss did not take into account: (1) days lost because of strikes; (2) sick days; (3) loss of overtime; (4) plant closings; and, (5) unemployment associated with cyclical downturns in the economy.

The defendants maintain that the plaintiff did not prove greater damages, and we are not unmindful of the general rules that "[t]he testimony of expert witnesses is not exclusive, and does not necessarily destroy the force or credibility of other testimony. The jury has a right to weigh the testimony of all the witnesses, experts and otherwise; and the same rule applies as to the weight and credibility of such testimony." [Citations omitted] *Webb v. Chesapeake & O. Ry. Co.,* 105 W.Va. 555, 144 S.E. 100, at 103, *cert. denied,* 278 U.S. 646, 49 S.Ct. 82, 73 L.Ed. 559 (1928).

■ Indeed, we reaffirm the propositions that the jury has the right to weigh the testimony of all witnesses, experts and otherwise, *Middle–West Concrete Forming and Equipment Co. v. General Insurance Co. of America,* 165 W.Va. 280, 267 S.E.2d 742 at 747 (1980), and that the jury is to give only as much weight and credit to expert testimony as the jury deems it entitled to when viewed in connection with all the circumstances. *Ward v. Brown,* 53 W.Va. 227, 44 S.E. 488 (1903). Certainly, "[a] jury is not bound to accept as conclusive the testimony even of an unimpeached

witness." *Chesapeake & O. Ry. Co. v. Barger*, 112 Va. 688, 72 S.E. 693 at 695 (1911).

■ Nonetheless the proper rule in cases of this type is articulated in the syllabus of *Freshwater v. Booth, supra*, where we said:

"In a tort action for property damage and personal injuries this Court will set aside the jury verdict and award a new trial on all issues where: (1) the jury verdict is clearly inadequate when the evidence on damages is viewed most strongly in favor of defendant; (2) liability is contested and there is evidence to sustain a jury verdict in favor of either plaintiff or defendant; and (3) the jury award, while inadequate, is not so nominal under the evidence as to permit the court to infer that it was a defendant's verdict perversely expressed."

Indeed, this case is perhaps the mirror image of *Roberts v. Stevens Clinic Hosp., Inc.*, 176 W.Va. 492, 345 S.E.2d 791 (1986) where we entered a $7,000,000 remittitur in a medical malpractice wrongful death case. Originally a McDowell County jury had awarded $10,000,000 for the death of a minor child, but we held:

The sky is not the limit with regard to jury awards, and at some point premium payers—who are somewhat like taxpayers—must be protected from paying excessive premiums.

176 W.Va. at 504, 345 S.E.2d at 804. If, indeed, we must determine the upper limits to jury awards, as we did in *Stevens Clinic*, notwithstanding that such a determination is highly subjective, it is then also appropriate that we vouchsafe a fair floor to such awards. In *Stevens Clinic* we also pointed out:

Obviously, if the measure of damages were the value of a human life then, arguably, no jury verdict could be excessive. The death of a family member, particularly a child, involves inconsolable grief for which no amount of money can compensate.

*Id.* 176 W.Va. at 500, 345 S.E.2d at 800. Certainly the same applies to the loss of a husband and father.

■ In the case before us our decision is informed to some extent by the fact that the plaintiff is a black woman suing for the death of a black husband and father on behalf of herself and four black children. In cases of this type involving white plaintiffs, when plaintiffs prevail at all, the awards (as, for example, in *Stevens Clinic*) are substantially higher. A case study of jury verdicts rendered in Cook County, Illinois from 1959–1979, reveals that black plaintiffs received substantially less than white plaintiffs for the same injury when adjusted for the differences in claimed economic losses. Chin & Peterson, *Deep Pockets, Empty Pockets: Who Wins in Cook County Jury Trials* (1985, Rand Institute for Civil Justice). "On average, black plaintiffs received only three-fourths as much compensation as whites who had the same injury, lost income, and type of legal claim." *Id.* at 38. In addition, white plaintiffs were six percent more successful on the issue of liability than black plaintiffs similarly situated. *Id.* at 37. In short, it is well documented that some jury awards are affected by the race of the plaintiff.[1] Although we are not sure that the plaintiff will prevail at all on retrial, we believe that if she is entitled to anything at all, she is entitled to more than $250,000 reduced by forty percent for her decedent's contributory negligence.

Accordingly, for the reasons set forth above, the judgment of the Circuit Court of Kanawha County is reversed and the case is remanded for a new trial on all issues.

Reversed and remanded.

WORKMAN, J., deeming herself disqualified, did not participate in the consideration or decision of this case.

---

**1.** A parallel problem in the context of criminal cases is sufficiently serious that the U.S. Supreme Court in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), significantly lowered the evidentiary burden facing a criminal defendant who claims racially motivated use of peremptory jury challenges by the prosecution. *See also State v. Marrs*, 180 W.Va. 693, 379 S.E.2d 497 (1989).