******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ESPINOSA, J., concurring. In view of the questions that the United States Court of Appeals for the Second Circuit chose to certify to this court, I am compelled to agree with the majority's answers to those questions. Specifically, I agree that (1) it is the role of the legislature and not of this court to exempt schools from liability for remote harms such as insect-borne[1] disease that may befall students on study abroad programs, and (2) we must defer to the determination by the United States District Court for the District of Connecticut that the jury verdict, while disquietingly large, is not so clearly the result of partiality, prejudice, mistake or corruption that remittitur is required. I write separately to express my hope that the Court of Appeals will revisit its legal determination that there was sufficient evidence to support the jury's finding that the injuries suffered by the plaintiff Cara L. Munn[2] were reasonably foreseeable; see *Munn* v. *Hotchkiss School*, 795 F.3d 324, 329 (2d Cir. 2015); a question on which that court has not sought our counsel.

I

I begin by reviewing the relevant legal standards. As the Court of Appeals recognized; id., 329–30; our law permits a jury to find that a harm is foreseeable only if "an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was *likely* to result . . . ." (Emphasis added; internal quotation marks omitted.) *Sic* v. *Nunan*, 307 Conn. 399, 407, 54 A.3d 553 (2012). "[D]ue care does not require that one guard against eventualities which at best are too remote to be reasonably foreseeable." (Internal quotation marks omitted.) Id., 409. "Accordingly, the fact finder must consider whether the defendant knew, or should have known, that the situation at hand would obviously and naturally, even though not necessarily, expose [the plaintiff] to *probable* injury unless preventive measures were taken." (Emphasis added; internal quotation marks omitted.) *LePage* v. *Horne*, 262 Conn. 116, 124, 809 A.2d 505 (2002); see also id. (" 'ordinary care has reference to probabilities of danger rather than possibilities of peril' "); *Lodge* v. *Arett Sales Corp.*, 246 Conn. 563, 575–76, 717 A.2d 215 (1998) ("[i]nasmuch as virtually all harms, in hindsight, are literally foreseeable . . . the law has rejected a literal foreseeability test as the fulcrum of duty" [citation omitted; internal quotation marks omitted]). Negligence is, therefore, to be distinguished from an accident, insofar as "an accident is an unexpected happening [whereas] negligence is based on something reasonably to be anticipated." *Higgins* v. *Connecticut Light & Power Co.*, 129 Conn. 606, 613, 30 A.2d 388

(1943).

Consistent with these principles, this court has found that a harm was not reasonably foreseeable, as a matter of law, when the injury, although not beyond the realm of the conceivable, could only be fairly characterized as highly improbable. See, e.g., *Sic* v. *Nunan*, supra, 307 Conn. 409 ("being thrust into the travel lane of oncoming traffic while one is lawfully stopped awaiting an opportunity to turn simply does not fall within the category of foreseeable risk"); *Lodge* v. *Arett Sales Corp.*, supra, 246 Conn. 577 ("the brake failure of a negligently maintained fire engine is beyond the scope of the reasonably foreseeable risks created by the transmission of a false alarm"); *Schiavone* v. *Falango*, 149 Conn. 293, 298, 179 A.2d 622 (1962) (not reasonably foreseeable that unattended child would climb and fall from exterior stairway railing); *Noebel* v. *Housing Authority*, 146 Conn. 197, 201–202, 148 A.2d 766 (1959) ("[i]t is unreasonable as a matter of law to charge the defendants with anticipation of the likelihood that . . . someone in a hurry might try to jump over [a fence comprised of rubber-covered wooden stakes], misjudge its height or his own agility, and fall"); *Goldberger* v. *David Roberts Corp.*, 139 Conn. 629, 630, 96 A.2d 309 (1953) (jury could not reasonably find it foreseeable that teenage camper, described as " 'problem child,' " having been instructed to dispose of wooden stick and then left unsupervised, would swing stick in tent, resulting in broken fragment striking and injuring younger boy).[3] As I explain in the next part of this concurring opinion, none of the risks that we deemed to be legally unforeseeable in the cited cases was as demonstrably and quantifiably remote as the risk that the plaintiff would contract tick-borne encephalitis (TBE) or some other serious insect-borne illness during her brief field trip to Mount Panshan (Mt. Pan) in the Tianjin province of China.

II

A

The record reveals the following undisputed facts. The plaintiff was the first known United States citizen—and quite possibly the first foreign traveler—ever to contract TBE in China. She caught the disease at a popular tourist destination within commuting distance of Beijing—one that receives over 600,000 visitors each year, including more than 50,000 foreign tourists—in a province in which no human case had ever been reported.

TBE is an extremely rare disease. In total, only 10,000 to 12,000 individuals worldwide contract the disease each year. Of those cases, the vast majority occur in Russia and central Europe. In China, the primary TBE risk in 2007 was understood to exist along China's far northern borders with Russia and Mongolia, hundreds

of miles north of Mt. Pan. Depending on which disease distribution map one credited, Tianjin province was either completely outside or just on the outskirts of the recognized endemic area.

The plaintiff's expert testified that, even within endemic areas, the risk to travelers is low unless *extensive* outdoor activities are planned. Immunization against the disease is not available in the United States. In countries in which vaccination was available in 2007, it was recommended only " 'for prolonged stays that include hiking, camping or similar outdoor activities in rural wooded regions of risk areas.' " Notably, the itinerary of the defendant, The Hotchkiss School, did not include any prolonged activities in such environments. At Mt. Pan, the students followed a paved path up the mountain, and they were to have come down in a cable car. Jean Yu, the defendant's faculty trip leader, testified that she permitted the plaintiff and a few other students to walk back down the mountain only after they had promised to remain on that same paved path. To conclude that the plaintiff's injuries were foreseeable, then, one would have to find, among many other things, that it was likely that students would seek and receive permission to walk back down the mountain, disobey safety instructions, leave the pathway, and bushwack their way to the bottom.[4] Such an inference is precluded by our conclusion in *Goldberger* v. *David Roberts Corp.*, supra, 139 Conn. 632–33, that a counselor could not, as a matter of law, be expected to foresee that a thirteen year old camper would ignore safety instructions while outside adult supervision, resulting in unlikely injuries.

Even in areas in which TBE is endemic, the vast majority of ticks do not carry the disease. If bitten by an infected tick, a person has just a 0.005 to 0.001 chance of contracting TBE. Among those infected, most do not suffer any neurological injury. In other words, the probability that one of the defendant's students, having requested permission to walk down Mt. Pan and promising to remain on the path, would disregard her teacher's warnings, leave the trail, become lost in the vegetation, get bitten by one of the rare infected ticks, contract the disease, and suffer permanent injury was infinitesimally low.

The statistic that I find most remarkable comes from plaintiff's exhibit 34, a publication of the Centers for Disease Control and Prevention (CDC), Morbidity and Mortality Weekly Report dated March 26, 2010, and entitled "Tick-Borne Encephalitis among U.S. Travelers to Europe and Asia—2000–2009." In that report, the CDC, having reviewed all laboratory records for the prior decade, concluded that only five United States travelers had contracted TBE while overseas and that the plaintiff was the first ever to have contracted the disease in China. On the basis of its research, the CDC—

which the parties agree is the most authoritative source on such matters—reached the following conclusion: "For unvaccinated travelers to areas in which TBE is endemic, the estimated risk for TBE during . . . transmission season is approximately one case per 10,000 person months." *One case per 10,000 months.* In other words, if the plaintiff and ten thousand of her classmates spent the full month of July living in the semirural area around Mt. Pan, only one of them would likely contract TBE. The plaintiff herself could have lived on Mt. Pan for more than one millennium before she would have been expected to catch the disease. She was there for just a few hours. By my calculations, she had less than a one in two million chance of contracting TBE during her brief field trip to Mt. Pan,[5] lower even than her chance of being struck and killed by a meteorite.[6] If that was foreseeable, then it is difficult to imagine any misfortune that would not be.[7]

It bears emphasizing in this respect that the only reason that it was even conceivably foreseeable that an American tourist would contract TBE while sightseeing at Mt. Pan was because TBE *may* have been identified as a risk on the CDC's China webpage. But see part II B 1 of this concurring opinion. There was no evidence or testimony at trial, however, indicating that the various miscellaneous diseases listed near the end of a CDC travel advisory page occur with any particular frequency, nor that a disease that the CDC identifies as present in a country or a region necessarily poses a risk *throughout* that country or region. China is a large country, with a landmass roughly the size of the United States. Thus, the fact that a disease such as TBE occurs somewhere in the northeastern quadrant of China does not mean that an affliction found near the Siberian border necessarily poses a risk in Beijing or Tianjin, any more than the Zika virus endemic to south Florida threatens tourists visiting Kansas City or Saint Louis, which also are located in the southeastern quadrant of our country.

In this instance, the CDC itself actually quantified the risk involved, indicating that it was minuscule. There simply was no basis, then, on which a jury reasonably could have concluded that it was *likely* or *probable* that the plaintiff would contract TBE[8] at Mt. Pan, as our law requires before liability for negligence will lie.

B

In light of the abundant, authoritative, and uncontroverted evidence that TBE is an extremely rare disease, one that posed a negligible risk to the hundreds of thousands of foreign visitors to the Mt. Pan area as of 2007, the Court of Appeals reached the only reasonable conclusion: "no one could have expected that [the plaintiff] would contract TBE." *Munn* v. *Hotchkiss School,* supra, 795 F.3d 332. One would have thought that would have ended the inquiry, that the fact that *no one could*

*have expected* a certain outcome would, almost by definition, render that outcome unforeseeable.[9] Indeed, I am not aware of a single case in any jurisdiction in which a risk that was as quantifiably improbable as this was deemed to be reasonably foreseeable.

But they say that on a clear judicial day you can foresee forever; *Thing* v. *La Chusa*, 48 Cal. 3d 644, 668, 771 P.2d 814, 257 Cal. Rptr. 865 (1989); and both the District Court and the Court of Appeals were able to persuade themselves that the plaintiff's injuries were sufficiently probable to sustain the jury's verdict. In declining to hold as a matter of law that the plaintiff's injuries were unforeseeable, those courts relied primarily on the facts that (1) the defendant had actual foreknowledge of the risk of TBE in northeast China; *Munn* v. *Hotchkiss School*, supra, 795 F.3d 330; and (2) a finding of foreseeability was not unreasonable in light of the relatively painless measures that could have been taken to protect the plaintiff.[10] *Munn* v. *Hotchkiss School*, 24 F. Supp. 3d 155, 179, 198 (D. Conn. 2014). I consider each theory in turn.

1

I first consider the primary theory on which the Court of Appeals relied, namely, that the defendant had actual foreknowledge that TBE and other serious insect-borne diseases posed a risk to students travelling to Mt. Pan. There is no evidence in the record that any employee of the defendant ever saw an authoritative government warning indicating that TBE was endemic to Tianjin or Mt. Pan. The only employee of the defendant who allegedly saw any CDC warning relating to the presence of TBE anywhere in China was international travel programs director David Thompson. At trial, Thompson initially testified that, at the time of the trip, he saw a warning on the CDC's China webpage indicating that TBE was present in northeast China. He immediately qualified this testimony, however, explaining that the CDC website carried such a warning *at the time of trial* but that he did not recall whether any references to TBE had been posted prior to the June, 2007 trip. Thompson also testified that, in any event, the CDC warning did not mention Tianjin and that he did not believe that Tianjin was encompassed by the CDC's definition of "Northeastern China," which he understood to cover only China's far northern border areas with Russia and Inner Mongolia.[11] Given his lack of recollection, he ultimately concluded that "it might be useful to see what it is that the CDC said at that time because—it's been so long, and I don't want to be inaccurate."

In response, the plaintiff's counsel showed Thompson defendant's exhibit 546, which was a version of the CDC's China webpage that had been archived on the Internet Archive's Wayback Machine. See generally http://archive.org/web/web.php (last visited July 27,

2017). The webpage, which had been archived in December, 2007, indicated that it was created and last modified on August 1, 2007, nearly two months *after* the defendant's trip commenced and more than three months *after* Thompson and Yu provided students and their parents with a link to the CDC website and other health-related trip information. Confronted with this August, 2007 document stating that "[TBE] occurs in forested regions in northeastern China," and asked whether "that's something you knew at the time from reading the material," Thompson replied: "Yes, I believe I would have seen that." Thompson never expressly testified that he saw such a warning on the CDC website prior to the June, 2007 trip. He simply acknowledged that he *would have* seen it *at the time* that it was posted on the CDC website.

The fact that the CDC webpage was not created until August 1, 2007, precludes any possibility that Thompson reviewed that particular webpage at an earlier date. His tepid acknowledgement that he "would have seen" the August, 2007 report at some unspecified time, which followed repeated statements by Thompson that he did not recall whether he had seen any warnings about TBE prior to the trip, is the sole evidence of record to support the conclusion that any employee of the defendant saw a TBE warning on an authoritative government website prior to the trip. Moreover, it is undisputed that the April 13, 2007 version of the CDC Travelers' Health page covering East Asia, including China, did not identify TBE as a disease endemic to that region. Notably, that webpage did specifically identify various other diseases, such as avian influenza, malaria, and severe acute pulmonary syndrome, also known as SARS, as being present in China. One week later, on April 21, 2007, the defendant sent health information to trip participants and their families and referred them to the CDC website.

Still, the Court of Appeals was of the opinion that, "while the August 1, 2007 advisory postdates the trip, it is possible that a similar advisory was on the website before" the students embarked for China. *Munn* v. *Hotchkiss School*, supra, 795 F.3d 330. That is certainly one possibility, that sometime between April 13 and early June, 2007, the CDC suddenly changed its assessment of the risk of TBE in China, despite the fact that no foreign traveler had contracted the disease during that time. If that was the case, none of the plaintiff's travel health experts was able to explain what precipitated the new risk assessment at that time. A second possibility, of course, is that the CDC did not update its assessment until August 1, 2007, right after the plaintiff's blood had tested positive for TBE antibodies.

Although the evidence was not before the trial court, we now know that the latter, more plausible scenario is what actually happened. On direct appeal, the defendant asked the Court of Appeals to take judicial notice

of the fact that the same database on which the August, 2007 CDC webpage was archived also contains a version of that webpage that was created on May 25, 2007, two weeks before the students left for China, and that remained active and was archived on June 25, 2007, two weeks after the trip commenced. See id.; see also https://web.archive.org/web/20070625010918/ wwwn.cdc.gov/travel/destinationChina.aspx (last visited July 27, 2017). That webpage makes no mention of TBE as a risk in China. In reality, then, Thompson could not possibly have seen the warning contained in the August 1, 2007 webpage prior to the trip, because the version of the website that was accessible to the public before and during the trip did not contain any such warning.[12]

The Court of Appeals denied the defendant's eleventh hour attempt to supplement the record with a copy of the May 25/June 25 webpage. See *Munn* v. *Hotchkiss School*, supra, 795 F.3d 330. The court did so despite the fact that the federal courts—both trial and appellate— routinely take judicial notice of CDC websites,[13] and also of the Internet Archive's Wayback Machine as reliable evidence of how a particular website appeared on a particular date.[14] In any event, in light of Thompson's clear hesitation to affirmatively testify that he had seen any reference to TBE in China prior to the trip, the Court of Appeal's speculation that there might possibly have been some reference to that effect on the CDC website seems a rather slim reed on which to hold the plaintiff's injuries foreseeable.

2

The District Court, in concluding that there was sufficient evidence to sustain a finding of foreseeability, also applied the Learned Hand formula, pursuant to which reasonable care is required only if the burden of adequate precautions is less than the gravity of an injury discounted by the probability that the injury will occur. See *United States* v. *Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947). The District Court apparently was of the view that, notwithstanding the remote probability of a tourist contracting TBE or other serious insect-borne disease at Mt. Pan, the defendant was obliged to take precautionary measures because (1) the potential consequences of diseases such as TBE are severe, and (2) the burdens of prevention—warning or requiring students to wear long sleeved shirts and long pants, apply insect repellants containing diethyltoluamide (DEET), and perform periodic tick checks—appear "minimal." *Munn* v. *Hotchkiss School*, supra, 24 F. Supp. 3d 198.

It is not clear to me that Connecticut has embraced the law and economics definition of foreseeable harm as expressed in the Learned Hand formula.[15] As I have explained, our cases consistently have defined a foreseeable harm simply as one that is likely to occur or that

reasonably can be anticipated, without any reference to the burdens of prevention or the magnitude of the risk involved. Even if we were to assume that those considerations are relevant to the foreseeability question,[16] however, I do not agree that they were sufficient to overcome the infinitesimally low probability that one of the defendant's students would contract TBE at Mt. Pan.

a

Turning first to the magnitude of the risk prong of the equation, no one disputes that TBE is a potentially serious disease. Although many cases are entirely asymptomatic, and many others result in a full recovery, for individuals like the plaintiff, who are unlucky enough to contract a serious case, the long-term effects are devastating. But the reality is that if a student had merely stubbed her toe while walking down Mt. Pan, we would not be having this conversation. Most of the risks about which travelers worry—and sue—when visiting exotic, foreign destinations are ones that carry potentially serious, if not fatal, consequences. These risks run the gamut from tropical diseases to medical emergencies, food poisoning, street crime, terrorism, civil unrest, transportation accidents, extreme weather events, animal attacks, and random imprisonment. The list of remote but serious risks is, literally, endless.

Consider just a few of the freak accidents, illnesses, and injuries that might befall a visitor to China. In recent years, tourists to China have been mauled to death by zoo tigers,[17] caught up in airport riots,[18] murdered by Uighur terrorists,[19] robbed in bars,[20] injured under collapsing bridges,[21] and killed in various ways at scenic lookout points.[22] Chinese authorities have imprisoned tourists for using their cellphones on airplane mode[23] and for watching a British Broadcasting Corporation documentary.[24] A visitor to the country could fall victim to a novel strain of avian flu[25] or to an ancient affliction such as the bubonic plague.[26] They could be poisoned by street food[27] or contaminated sashimi;[28] knocked off the Great Wall of China[29] or stoned by Buddhist monks.[30] In bus accidents alone, foreign travelers have been injured or killed when their tour buses burst into flames,[31] plummeted into a valley,[32] fell off a cliff,[33] or were buffeted by falling rocks during an earthquake.[34]

If a school such as the defendant is required to not only warn students about the risk of a disease as rare as TBE but also to protect them from such a risk while travelling abroad, then it must take comparable precautions with respect to all of the other singular risks that attend foreign travel. As the Court of Appeals recognized in certifying the duty question to this court, "this case is likely to have repercussions beyond this particular fact pattern as it implicates broad questions of Connecticut public policy." *Munn* v. *Hotchkiss School*, supra, 795 F.3d 334.

The defendant's staff could have spent many pages and many hours warning their students about and preparing them against these and numerous other serious but undeniably remote risks, not to mention the myriad of more mundane dangers that confront visitors to China—everything from air pollution and motor vehicle accidents to sunburn and sexually transmitted diseases. It is difficult to know how the risk of a rare tick-borne illness would have rated in this parade of horribles, but one suspects that the typical teenager would have paid it less mind than some of the more outlandish dangers. As the amici wisely caution, "[e]ven if educators could warn of and guard against every such risk, the information overload would leave students and parents in a maze of warnings . . . . [Such a requirement] would have the . . . negative effect of . . . burying warnings about imminent risks among a litany of other warnings . . . ." Indeed, requiring that trip planners lecture teen travelers about every possible foreseeable risk would likely have the unintended consequence of *jeopardizing* student safety by diverting their attention from the more credible risks.

Even under an economics based approach, then, it makes no sense to require that a school warn and prepare its students against each and every remote but potentially serious risk that awaits international travelers. The task would be as hopeless as it would be self-defeating. This court has recognized as much in the closely related context of medical informed consent, wherein a physician need not disclose to patients every remote risk potentially associated with a medical procedure but only those deemed sufficiently likely as to be material. See *Pedersen* v. *Vahidy*, 209 Conn. 510, 517–23, 552 A.2d 419 (1989). Put differently, the Learned Hand formula may make sense in the context of determining whether reasonable care requires the adoption of an *individual* precautionary measure. We must be wary, however, in cases such as this that sound in informed consent, lest the need to warn and protect participants against each individual remote but potentially serious outcome has the aggregate effect of inuring us to more substantial risks or discouraging participation in generally safe and wholesome activities.

b

I turn next to the other side of the Learned Hand equation, the question of whether the protective measures necessary to prevent students from contracting TBE were truly minimal and unobtrusive. One challenge in addressing this question is that the jury, in finding that the defendant failed to protect the plaintiff, did not specify what protective measure or measures the defendant should have adopted. The District Court, in upholding the verdict, speculated that merely "provid[ing] students with simple, accurate advice about

the risk of insect-borne disease and then a quick, gentle reminder to apply bug spray before hiking" might have been sufficient to satisfy the defendant's duty to the plaintiff. *Munn* v. *Hotchkiss School*, supra, 24 F. Supp. 3d 198 n.24. The truth, however, is that, throughout the trial, the plaintiff's counsel repeatedly reminded the jury that the defendant does not allow its male students to attend class without jackets and ties and that teachers send students back to their rooms if they show up to the school's annual Eco Day wearing inappropriate footwear. In the same breath, counsel told the jury that the defendant had a responsibility "*to be sure* [students] wear the right type of clothing, *to be sure* that they use . . . effective repellent, *to be sure* that they stay out of the woods without using these precautions . . . . These are not difficult precautions to *enforce*." (Emphasis added.) The plaintiff's counsel also emphasized how governmental agencies *mandate* that their employees use insect disease precautions in the field. Thus, while one can always speculate, the most reasonable reading of the verdict, in light of how the plaintiff argued the case, is that the jury found that the defendant's employees were negligent in not *forcing* the students to (1) wear long pants and long sleeved shirts, apply DEET, and conduct tick checks, or (2) remain on the bus if they refused. This conclusion is bolstered by the fact that one of the plaintiff's witnesses, another student who attended the trip, testified that the defendant's teachers not only instructed the students to bring insect repellant on the trip but also repeatedly reminded them to use it while in China. So that clearly was not enough.

Of course, in retrospect, any parent, familiar with the facts of the present case and the terrible injuries that the plaintiff has sustained, would think it a small price to pay to make their child use insecticide and wear protective clothing. If I thought it at all likely that my child would suffer such a fate, then no protective measure would be too onerous. But the relevant question is whether a reasonable school or parent, ex ante, knowing that the chance of contracting TBE was less than one in two million and the chance of suffering permanent damage lower still, would have required high school students to take such precautions. I would not.

There was undisputed testimony that it was uncomfortably hot when the students visited Mt. Pan in the late morning or early afternoon of June 23, 2007, and recorded weather data confirm that temperatures in the region approached 90 degrees Fahrenheit on that day.[35] It is difficult enough to get teenagers to wear long pants and long sleeved shirts in March or November, let alone in the heat of the summer. To force them to swap out their shorts and tank tops for jeans and turtlenecks, merely to protect against diseases that were virtually unknown at Mt. Pan and that no tourist had ever contracted, strikes me as both unreasonable and unrealistic. Surely the risk that a student would

have suffered dehydration, hyperthermia, or heat exhaustion from climbing a mountain in fall clothing on a 90 degree June day was a far more pressing concern.

What about the bug spray? It is true that DEET is deemed by the federal government to be safe for human use.[36] As discussed at trial, however, not all parents are comfortable with putting such a strong chemical insecticide on their children, at least when not absolutely necessary, and many families decline to use DEET even in areas in which serious insect-borne illnesses are pervasive. Indeed, there was uncontested expert testimony at trial that even United States Marines serving in tropical environments who are under direct orders to apply DEET routinely refuse to do so and risk malaria rather than subject themselves to such a "major intervention."

Nor can we consider these costs in a vacuum. The jury verdict in this case, as affirmed by the District Court and the Court of Appeals, stands for the proposition that a school has a duty to warn and protect its students against *any* remotely foreseeable harm that might befall them while travelling abroad or, at least, any remotely foreseeable serious risk, the existence of which may be readily and reliably determined. As I have explained, the range of such risks is virtually limitless. So too are the protective measures that might be taken to shield children from all those threats.

As evidenced by the literature that the defendant's trip chaperones provided to the students and their families, simply protecting students from the most common risks faced by overseas travelers requires constant vigilance toward a broad range of threats. Students travelling to China were cautioned, among many other things, to: keep a low profile; never leave their possessions unattended; report unattended bags to the police; never agree to carry a package for anyone; carry emergency phone numbers, extra cash, health insurance information, and a separate copy of identification documents; not carry too much cash or too many credit cards; avoid dangerous areas, short cuts, narrow alleys, and poorly lit streets; try not to be out on the streets alone at night; ignore negative comments and pick-up lines; beware con artists, pickpockets, and beggars; be especially cautious at train stations, shopping areas, and public transportation; be wary while making phone calls; abstain from intimate sexual contact; carry one's own supply of spermicidal latex condoms in a cool, dry place; be wary of foreigners who trade on stereotypes of American sexual values; remember that blood transfusions may carry a risk of HIV infection; prepare for temperature changes and rain; be mindful of feelings of homesickness, boredom, fatigue, physical discomfort, depression, helplessness, and hostility to the host culture; dress respectably and appropriately; and try to maintain a healthy mind and body.

Then consider all of the various remote risks for which special precautions could be taken. The defendant might have asked the students to wear bee masks on Mt. Pan, given the serious threat posed by giant killer bees in parts of northern China.[37] Teachers could have roped students together like mountain climbers atop the Great Wall to prevent a fatal fall, or made them take all their meals at the Tianjin McDonald's, lest they be sickened by the local cuisine.

Returning to the point I made before, none of those safety measures, standing alone, is especially oppressive relative to the serious risk of injury or death that it might prevent. Taken together, however, all of the minor protective measures that a school might impose in order to shield students from the plethora of remote risks that one confronts when travelling abroad *would* be oppressive. If my children were travelling to the hypothetical malaria-ridden swamp to which the parties referred throughout trial, then of course I would want them to take the appropriate prophylactic measures, regardless of side effects and regardless of inconvenience. But I would not expect them to visit major tourist attractions on a hot summer day covered in chemical sprays and cocooned in all manner of protective clothing, merely to ward off perils that might impact a few extremely unlucky individuals each year in a country of more than one billion people.

c

Finally, if we are going to weigh the economic costs and benefits associated with preventative measures, then we also must take into account the fruits that flow from letting adolescents engage in activities that have not been completely sanitized of risk. Study abroad and outdoor activities such as hiking are attractive and beneficial precisely because they are attended by certain risks, and challenge participants in certain ways, beyond what students normally confront in the controlled school environment. See K. Burch, "Going Global: Managing Liability in International Externship Programs—A Case Study," 36 J.C. & U.L. 455, 495 (2010). In this case, for instance, part of the defendant's curriculum was to encourage groups of students to venture into Tianjin without adult supervision, forcing them to use their emergent Chinese language skills to find the restaurant where the group was to dine that evening. If schools are forced to sterilize such activities to the point that even the most remote risks have been eliminated, then we will deprive our youth of much of the opportunity for independence, experiential learning, and personal growth that comes from surmounting such challenges—not to mention taking all the fun out of them. As one legal scholar has explained, "[t]he objective of focusing on safety concerns related to study abroad is not to offer a risk-free foreign experience. That goal is no more desirable than the idea that car

manufacturers should produce risk-free vehicles so crash-worthy and slow that no one could ever be harmed in an auto-accident and no suit ever filed. Education inevitably entails risks, particularly when it takes place in another country. Exposing students to some of those risks is part of the educational process. . . . American program providers should not operate super-cautious foreign programs . . . ." (Footnotes omitted.) V. Johnson, "Americans Abroad: International Educational Programs and Tort Liability," 32 J.C. & U.L. 309, 315–16 (2006).

Of course, as parents, we would love to be able to put our children into all sorts of challenging, character building situations, yet have them always walk away successful and unscathed. But life is not a Disney movie, and that is not a realistic expectation. As both this court and others frequently have observed, it would be unwise, if not impossible, to impose such a duty on schools and related entities. See *Goldberger* v. *David Roberts Corp.*, supra, 139 Conn. 631–32; see also *Gustin* v. *Assn. of Camps Farthest Out, Inc.*, 267 App. Div. 2d 1001, 1003, 700 N.Y.S.2d 327 (1999) ("[i]n such a setting, constant supervision is neither feasible nor desirable because [o]ne of the benefits of such an institution is to inculcate self-reliance in the [participants] which an overly protective supervision would destroy" [internal quotation marks omitted]).

C

In light of these considerations, it is no surprise that courts in other jurisdictions, considering claims arising from improbable injuries sustained on school trips, have not hesitated to hold such risks unforeseeable as a matter of law. See, e.g., *Mancha* v. *Field Museum of Natural History*, 5 Ill. App. 3d 699, 701, 283 N.E.2d 899 (1972) (affirming dismissal of action because "[i]t cannot be said that an assault on a [twelve year old] boy in the Field Museum is an occurrence which a reasonable man would anticipate"); *David* v. *New York*, 40 App. Div. 3d 572, 573, 835 N.Y.S.2d 377 (2007) (directing judgment dismissing complaint arising from unprecedented injury during hay ride). I would encourage the Court of Appeals to reach this same conclusion.

Barring that, I hope that our legislature will follow the example of California[38] and confer full or partial statutory immunity[39] from suit on study abroad and related programs, in furtherance of Connecticut's well established policy of promoting and expanding international education and foreign study programs. See General Statutes § 10-27. There is a reason why more than thirty organizations and associations representing in excess of 20,000 colleges, universities, graduate programs, private secondary schools, public boards of education, international education and exchange programs, camps, and outdoor experience programs all have appeared as amici curiae in this case, in support of

the defendant's position. These organizations recognize that this case invariably will come to stand for the proposition that foreign study—and perhaps all extracurricular—programs must not only warn of, but also affirmatively protect participants from, even the most remote risks and dangers. Such an outcome will adversely impact the ability of these programs to provide these tremendous opportunities in Connecticut, "radically and negatively impacting the number and type of international student experiences schools will continue to offer their students." As the Court of Appeals recognized, "[i]f the award stands, it would set an important precedent for negligence cases arising from educational trips. . . . This case is likely to encourage future victims of unusual accidents on educational trips to seek compensation, placing a heavy financial burden on trip providers." (Citation omitted.) *Munn* v. *Hotchkiss School*, supra, 795 F.3d 333. Even the District Court, which generally rejected the defendant's public policy arguments, conceded that "some schools may cancel programs" as a result of the verdict in this case. *Munn* v. *Hotchkiss School*, supra, 24 F. Supp. 3d 198. I fear that the impact will be especially harsh on our less privileged students and those who attend underfunded public schools.

I understand that other juries in other cases may not be as willing to find that other extremely improbable tragedies are foreseeable. But surely the unprecedented verdict in this case will attract the attention of potential plaintiffs who have suffered unlikely injuries while abroad. And surely the fact that the Court of Appeals has held such an "undeniably remote" injury to be foreseeable; *Munn* v. *Hotchkiss School*, supra, 795 F.3d 332; will place additional pressure on future defendants to settle such claims, regardless of their merits.

In short, other schools and programs will not have the luxury of ignoring equally remote risks, in the hope that other juries might be less generous or that other courts might draw firmer limits on foreseeability. Providers will have to conduct their affairs, plan their itineraries, and insure themselves as if they are strictly liable for any and all remote risks that might come to pass. Students will be the worse for it. We conduct our affairs in the shadow of the law, and this case casts a long shadow indeed.

[1] As the defendant, The Hotchkiss School, notes, the certified question is misleading insofar as ticks, the disease vector at issue in the present case, are not insects but arachnids, cousins of the spider and the mite. Following the convention that has been established in this case, I will use the term "insect-borne" as synonymous with the more accurate—but less ceremonious—term "bug-borne."

[2] Munn's parents, Orson D. Munn III and Christine Munn, were also named as plaintiffs in this matter. For simplicity, I refer to Cara L. Munn alone as the plaintiff.

[3] The Court of Appeals, relying on our decision in *Ruiz* v. *Victory Properties, LLC*, 315 Conn. 320, 107 A.3d 381 (2015), a premises liability case, concluded that Connecticut courts construe foreseeability especially broadly as it relates to children. *Munn* v. *Hotchkiss School*, supra, 795 F.3d 330. All that we stated in *Ruiz*, however, is that the degree of care that is required

vis-à-vis children varies according to their age and maturity, and that younger children may not appreciate the dangers inherent in their surroundings. *Ruiz* v. *Victory Properties, LLC*, supra, 332–33. The primary wild card in the present case is not, as in *Ruiz*, a *child's* conduct but, rather, the distribution of infected ticks and the epidemiology of the tick-borne virus. Accordingly, any inferences to be drawn from *Ruiz* about the unpredictability of children's behavior are largely irrelevant. To the extent that the plaintiff's own conduct and propensity to follow instructions is relevant to the foreseeability question, *Goldberger*, which involved a child much closer to the plaintiff's own age (albeit still several years younger), is more directly on point. *Goldberger* v. *David Roberts Corp.*, supra, 139 Conn. 629.

[4] It is true that liability for negligence may lie when "harm of the general nature as that which occurred is foreseeable . . . even though the manner in which the accident happens is unusual, bizarre or unforeseeable." *Pisel* v. *Stamford Hospital*, 180 Conn. 314, 333, 430 A.2d 1 (1980). Nevertheless, if the Mt. Pan trip itinerary only anticipated and only permitted walking on paved paths and travelling by cable car, activities that would have posed no risk of insect-borne disease, then harm of the general sort that the plaintiff suffered was foreseeable to the defendant only if it was likely that students would engage in a sylvan frolic of their own.

[5] The CDC noted that the risk of contracting TBE varies according to the degree of unprotected exposure in forested areas, and also that most cases occur during the months of March and November.

[6] See B. Howard, "What Are the Odds a Meteorite Could Kill You?," National Geographic (February 9, 2016), available at http://news.nationalgeographic.com/2016/02/160209-meteorite-death-india-probability-odds (placing odds at one in 1.6 million) (last visited July 27, 2017).

[7] By way of comparison, the plaintiff's own travel medicine expert wrote that a tourist is not considered to be at risk when the risk of contracting a particular disease is one in one million.

[8] It was no more likely that the plaintiff would fall victim to other harm of the general nature as that which she suffered. The evidence at trial suggested that contracting other serious insect-borne illnesses such as Japanese encephalitis during the field trip to Mt. Pan was highly improbable. There was undisputed evidence, for example, that no foreign tourist had contracted that disease in China during the previous decade, or ever in Tianjin, most likely because Japanese encephalitis is endemic only in rural pig and rice farming areas and is transmitted only at night. Indeed, the plaintiff's own travel medicine expert wrote that the average tourist is not at risk of contracting Japanese encephalitis in China.

Moreover, although there were a few brief references at trial to the presence of Lyme disease in China, the Court of Appeals appears to have accepted the defendant's argument that that disease is not a harm of the same general sort as TBE. I agree. Lyme disease is pervasive in Connecticut, and yet one need only visit the nearest park, playground, or sports field to see that wearing long pants and long sleeved shirts on a hot summer day is not the norm, however prudent such measures might be.

[9] Black's Law Dictionary (6th Ed. 1990), for example, defines foreseeability, among other things, as "[t]hat which is objectively reasonable to *expect*, not merely what might conceivably occur." (Emphasis added.)

[10] The federal courts also relied on the fact that various CDC advisories and other travel websites referenced a risk of TBE or Japanese encephalitis in China or East Asia. See *Munn* v. *Hotchkiss School*, supra, 795 F.3d 330; *Munn* v. *Hotchkiss School*, supra, 24 F. Supp. 3d 176–79. As I explain in part II A of this concurring opinion, however, just as a visitor to Cleveland need not take precautions against a disease such as the plague, which affects only a few individuals each year in the mountain west; see CDC, Morbidity and Mortality Weekly Report: Human Plague—United States, 2015 (Vol. 64, August 28, 2015), available at https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6433a6.htm (last visited July 27, 2017); the mere fact that a disease has occurred *somewhere* in China or Asia does not, in and of itself, make it likely that an American tourist will contract the disease during a visit to Mt. Pan.

[11] Mt. Pan is located approximately fifty miles due east of Beijing Capital International Airport. Accordingly, if the CDC travel warnings for northeast China encompassed the Mt. Pan area merely because Mt. Pan is located in the northeastern quadrant of the country, they also would cover the capital airport region and would apply to many international travelers to China.

[12] In addition, there was testimony at trial that, in 2007, the CDC published a specific article on TBE that did not list China among those countries in

which the disease was endemic.

[13] See, e.g., *United States* v. *Chester*, 628 F.3d 673, 692 n.4 (4th Cir. 2010); *Gent* v. *CUNA Mutual Ins. Society*, 611 F.3d 79, 84 n.5 (1st Cir. 2010); *Seddens* v. *McGinnis*, Docket No. 91-1500, 1992 WL 174541, *2 (7th Cir. 1992) (decision without published opinion, 972 F.2d 352 [7th Cir. 1992]); *Brown* v. *Federal Express Corp.*, 62 F. Supp. 3d 681, 683, 686–87 (W.D. Tenn. 2014), aff'd, 610 Fed. Appx. 498 (6th Cir. 2015).

[14] See, e.g., *Perera* v. *Attorney General*, 536 Fed. Appx. 240, 242 n.3 (3d Cir. 2013); *Distributorsoutlet.com*, *LLC* v. *Glasstree*, *Inc.*, Docket No. 11-CV-6079 (PKC) (SLT), 2016 WL 3248310, *2 (E.D.N.Y. June 10, 2016); *Erickson* v. *Nebraska Machinery Co.*, Docket No. 15-CV-01147-JD, 2015 WL 4089849, *1 n.1 (N.D. Cal. July 6, 2015); *Pond Guy, Inc.* v. *Aquascape Designs, Inc.*, Docket No. 13-13229, 2014 WL 2863871, *4 (E.D. Mich. June 24, 2014).

[15] The District Court did not cite to any Connecticut authority suggesting that we have.

[16] Of course, those considerations may be relevant to the distinct question of whether a breach of duty has occurred.

[17] See RT News, "Tourist Mauled to Death in Brutal Hour-Long Tiger Attack in Chinese Zoo" (January 29, 2017), available at https://www.rt.com/viral/375513-tiger-killing-china-zoo (last visited July 27, 2017).

[18] See T. Phillips, "Chinese Passengers Start Riot in Airport over Delayed Flights," The Telegraph (February 7, 2014), available at http://www.telegraph.co.uk/news/worldnews/asia/china/10623528/Chinese-passengers-start-riot-in-airport-over-delayed-flights.html (last visited July 27, 2017).

[19] See A. Krishnan, "Tiananmen Attack a 'Jihadi Operation': Islamist Group," TheHindu.com (May 28, 2016), available at http://www.thehindu.com/news/international/world/tiananmen-attack-a-jihadi-operation-islamist-group/article5386937.ece (last visited July 27, 2017).

[20] See Z. Tingting, "University Graduate Robs Foreigners in Beijing Bars," China.org.cn (November 4, 2013), available at http://china.org.cn/china/2013-11/04/content 30492897.htm (last visited July 27, 2017).

[21] See R. Pocklington, "Shocking Video and Pictures Show Tourists Plunge into Water as New Bridge Collapses," Mirror (October 14, 2013), available at http://www.mirror.co.uk/news/world-news/chinese-bridge-collapse-video-pictures-2369243 (last visited July 27, 2017).

[22] See C. Bodeen, "China: 1 Tourist Killed, 18 Hurt by Falling Rocks," San Diego Union-Tribune (July 21, 2013), available at http://www.sandiegouniontribune.com/sdut-china-1-tourist-killed-18-hurt-by-falling-rocks-2013jul21-story.html (last visited July 27, 2017); L. Qian, "Tourist Falls to Death after Posing at Cliff," ShanghaiDaily.com (August 28, 2013), available at http://www.shanghaidaily.com/nation/Tourist-falls-to-death-after-posing-at-cliff/shdaily.shtml (last visited July 27, 2017).

[23] See C. Custer, "Tourist in China Detained for 5 Days after Using Mobile Phone on Airplane," TechInAsia (October 17, 2012), available at https://www.techinasia.com/tourist-china-detained-5-days-mobile-phone-airplane (last visited July 27, 2017).

[24] See A. Laing & J. Ensor, "Elderly British Tourists Detained in China Were Arrested for 'Watching BBC Documentary,' " The Telegraph (July 18, 2015), available at http://www.telegraph.co.uk/news/worldnews/asia/china/11746637/China-to-deport-foreign-tourists-after-terror-video-case.html (last visited July 27, 2017).

[25] See L. Abrams, "New Bird Flu Claims Its First Victim," Salon.com (December 18, 2013), available at http://www.salon.com/2013/12/18/new_bird_flu_claims_its_first_victim (last visited July 27, 2017).

[26] See J. Kaiman, "In China, a Single Plague Death Means an Entire City Quarantined," TheGuardian.com (July 25, 2014), available at https://www.theguardian.com/cities/2014/jul/25/plague-death-china-quarantine-yumen-city (last visited July 27, 2017).

[27] See E. Crouch, "Beijing Street Meat Poisons Tourist, Definitely Wasn't Lamb," Shanghaiist (July 23, 2013), available at http://shanghaiist.com/2013/07/23/beijing_street_meat_poisons_tourist.php (last visited July 27, 2017).

[28] See A. Hodgekiss, "Sushi Lover's Entire Body Left Riddled with WORMS after Eating Contaminated Sashimi," DailyMail.com (September 24, 2014), available at http://www.dailymail.co.uk/health/article-2768117/Sushi-lover-s-entire-body-left-riddled-tapeworm-parasites-eating-contaminated-sashimi.html (last visited July 27, 2017).

[29] See C. Kitching, "Chinese Woman Dies after Being Accidentally Knocked over by Canadian Tourist at Great Wall of China," DailyMail.com (April 12, 2015), available at http://www.dailymail.co.uk/travel/travel_news/article-3035644/Chinese-woman-dies-accidentally-knocked-Canadian-tourist-Great-

Wall-China.htm (last visited July 27, 2017).

[30] See "Monks Beat Tourist with Stones and Hammers," CRI (August 7, 2013), available at http://www.china.org.cn/china/2013-08/07/content_29644989.htm (last visited July 27, 2017).

[31] See "China Highway Tourist Bus Fire Kills Six in Tianjin," BBC (October 1, 2012), available at http://www.bbc.com/news/world-asia-china-19782466 (last visited July 27, 2017); see also S. Yingying, "Extreme Heat Causing Vehicle Fires," ChinaDaily USA (July 17, 2013), available at http://usa.china-daily.com.cn/epaper/2013-07/17/content_16787740.htm (discussing spontaneous combustion of sightseeing bus) (last visited July 27, 2017).

[32] See "Yunnan Bus Crash Kills 8," Global Times (July 15, 2013), available at http://www.globaltimes.cn/content/796078.shtml (last visited July 27, 2017).

[33] See "Tourist Bus Falls from Cliff in China, 3 Killed," Zee News (April 29, 2013), available at http://zeenews.india.com/news/world/tourist-bus-falls-from-cliff-in-china-3-killed_845542.html (last visited July 27, 2017).

[34] See "Seven Tourists Injured, 300 Evacuated in Yunnan, China Earthquake," HTH Worldwide (September 3, 2013), available at https://www.hthstudents.com/extras/haiti_article_template.cfm?p_fn=ne_news_108576.html (last visited July 27, 2017).

[35] On June 23, 2007, the high temperature was 90 degrees in Beijing and 89 degrees in Tianjin. See https://www.wunderground.com/history/airport/ZBAA/2007/6/23/DailyHistory.html?req_city=&req_state=&req_statename=&reqdb.zip=&reqdb.magic=&reqdb.wmo= (last visited July 27, 2017); https://www.wunderground.com/history/airport/ZBTJ/2007/6/23/DailyHistory.html?req_city=Tianjin&req_state=&req_statename=China&reqdb.zip=&reqdb.magic=&reqdb.wmo= (last visited July 27, 2017); see also *Gaston* v. *Coughlin*, 249 F.3d 156, 165 (2d Cir. 2001) (appellate court may take judicial notice of historical temperature data); *Hadley* v. *Peters*, Docket No. 94-1267, 1995 WL 675990, *8 (7th Cir. 1995) (decision without published opinion, 70 F.3d 117 [7th Cir. 1995]) (same).

[36] See United States Environmental Protection Agency, "Safety Review of DEET," available at https://www.epa.gov/insect-repellents/deet (last visited July 27, 2017); see also "Reregistration Eligibility Decision (RED): DEET," EPA738-R-98-010 (September 1998), p. 6; Environmental Protection Agency, "DEET (N,N-Diethyl-meta-toluamide) Interim Registration Review Decision Case Number 0002," EPA-HQ-OPP-2012-0162 (September 2014), p. 9.

[37] See C. Pleasance, "China Goes to War with the Killer Giant Hornets That Have Claimed 42 Lives Already," DailyMail.com (October 8, 2013), available at http://www.dailymail.co.uk/news/article-2449483/China-goes-war-killer-giant-hornets-killed-42.html (last visited July 27, 2017).

[38] See Cal. Educ. Code § 35330 (d) (Deering 1995); see also *Sanchez* v. *San Diego County Office of Education*, 182 Cal. App. 4th 1580, 1584, 106 Cal. Rptr. 3d 750 (2010).

[39] For example, the legislature may wish to codify a version of the rule that the District Court adopted in *Mercier* v. *Greenwich Academy, Inc.*, Docket No. 3:13-CV-4 (JCH), 2013 WL 3874511, *5 (D. Conn. July 25, 2013), which held that a coach and school are liable only for reckless or intentional conduct resulting in player injury during a high school athletic contest. This may be an appropriate standard for situations in which imposition of a negligence standard risks sterilizing the activity and stripping it of its primary value or purpose.