******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

McDONALD, J., with whom PALMER, J., joins, dissenting. The question before this court is a simple one, but the majority does not directly answer it. Specifically, we are asked whether a municipal defendant's knowing failure to conduct any fire safety code inspection of a particular premises, despite a known statutory duty to do so, constitutes a reckless disregard of health or safety sufficient to waive governmental immunity pursuant to General Statutes § 52-557n (b) (8). Instead of answering that question, the majority implicitly acknowledges the inadequacy of such a claim by answering a different question: whether a municipality's blanket policy not to conduct inspections of premises to which this duty applies constitutes reckless disregard because such a policy inevitably creates the risk of unlikely, but potentially grave, harm to this class.[1] In so doing, the majority not only relies on a theory of the case never advanced by the plaintiff and contradicted by the evidence, but also adopts a novel standard of reckless disregard that is contrary to legislative intent and our case law. Under those circumstances, I am compelled to dissent.

The plaintiff, Twila N.A. Williams, as administratrix of the estates of four victims of an apartment fire, claimed that the failure of the municipal defendants[2] to conduct any fire safety code inspection of the public housing apartment at which the fatal fire occurred, despite knowing that it was their statutory duty to do so and that they had not done so, was the proximate cause of the deaths of the decedents, a mother and her young children. The plaintiff's theory in regard to this claim was that, had the municipal defendants conducted such an inspection, it would have revealed, among other things, that the apartment's smoke detectors were not interconnected as required by the state fire safety code. Although allegations that a mandated inspection could have prevented such a loss of life might engender feelings of anger toward the authorities in whom such responsibilities were vested, and empathy for the decedents' family, our legislature has decided, as a matter of public policy, that municipalities generally should be immune from liability for their failure to conduct such inspections.[3] Recognizing the competing strains on limited municipal resources, even when such inspections are mandated by law, our legislature has provided narrow exceptions to this immunity. A municipality's negligent failure to inspect, standing alone, is not enough to overcome governmental immunity; the municipality must have actual notice of a violation of law or a hazard to health or safety, or its failure to inspect must constitute a "reckless disregard for health or safety under all the relevant circumstances . . . ." General Statutes § 52-557n (b) (8). Because the munici-

pal defendants presented uncontroverted proof that they had no such notice, the present appeal turns on the latter.

Under a proper view of the law and the record, the municipal defendants were entitled to summary judgment on the claim of failure to inspect, given the theory of reckless disregard that the plaintiff advanced. The majority's conclusion to the contrary unfairly penalizes the municipal defendants for failing to disprove a theory that the plaintiff never advanced, and could not succeed upon had she advanced such a theory in light of the evidence before the trial court. More troubling, the majority effectively adopts a negligence per se standard that will likely have broad implications for every city, town, and borough in this state.

I

I begin with the question of what the standard of "reckless disregard for health or safety under all the relevant circumstances" contained in § 52-557n (b) (8) means. The majority's analysis of this issue is largely framed by questions that it deems relevant to evidence in the present case. As I explain in part II of this dissenting opinion, however, some of those questions are not implicated by the evidence or the plaintiff's theory of the case. Nonetheless, because its analysis has far reaching implications beyond this case, it is necessary to address the majority's standard in its entirety.

Although I find the majority's standard deficient in several significant respects, there are certain aspects of its analysis with which I agree. For the sake of avoiding redundancy, I acknowledge those aspects first and then turn to the basis of my profound disagreement.

I agree with the majority that the Appellate Court improperly interpreted the reckless disregard prong of § 52-557n (b) (8) to allow for recovery against a municipality when the failure to conduct a fire safety code inspection could have a "possible impact" on health and safety. See *Williams* v. *Housing Authority*, 159 Conn. App. 679, 694, 124 A.3d 537 (2015). As the majority properly notes, a possible impact standard finds no support in our case law addressing recklessness. More significantly, that standard contravenes the narrow construction that we are bound to give § 52-557n (b) (8), as it abrogates common-law municipal immunity. See *Ugrin* v. *Cheshire*, 307 Conn. 364, 382, 384, 54 A.3d 532 (2012); *Martel* v. *Metropolitan District Commission*, 275 Conn. 38, 57–58, 881 A.2d 194 (2005). Because inspections generally are mandated for the protection of health and/or safety, a possible impact standard would improperly afford a broad construction of the statute allowing for recovery for any injuries arising from any failure to inspect.

I also agree in part with the majority regarding the proper interpretation of reckless disregard of health or

safety under § 52-557n (b) (8). Specifically, I agree that reckless disregard of health or safety could be established when there is a risk of life threatening injuries, even if there is a relatively low probability of such a danger occurring.[4] I agree that fire safety code violations could contribute to such a risk, and that any reasonable person charged with inspecting for such violations; see General Statutes § 29-305; would be aware of that fact. With respect to the probability of such a harm occurring and the municipality's conscious disregard of that risk, I also agree that facts and circumstances that extend beyond the premises at which that risk actually manifested may be relevant.

However, I fundamentally disagree with significant aspects of the majority's standard. As I explain subsequently in this dissenting opinion, the principal flaws in its analysis are that the majority (1) fails to sufficiently distinguish reckless disregard from negligence, (2) fails to recognize that the burden of preventing the risk of harm is an essential element of recklessness, (3) fails to recognize that the reckless disregard prong of § 52-557n (b) (8) generally requires proof specific to the subject premises, and (4) improperly allows for aggregation of risk based solely on the shared circumstance of noninspection. The first two flaws relate to the proper meaning of "reckless disregard," and the latter two relate to the proper meaning of that term "under all the relevant circumstances."

I turn first to the meaning of reckless disregard. I begin with the undisputed proposition that, although § 52-557n (b) (8) refers to "reckless disregard," under our law, that term is synonymous with recklessness. See *Doe* v. *Boy Scouts of America Corp.*, 323 Conn. 303, 330, 147 A.3d 104 (2016) ("Wanton misconduct is reckless misconduct. . . . It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action." [Internal quotation marks omitted.]).

The statute provides no definition for the term, thus suggesting that our interpretation should be guided by the well developed body of common law using this term. The legislative history of § 52-557n, while not particularly illuminating,[5] also points us in that direction. In clarifying the contours of the immunity afforded to municipalities, one of the bill's authors, Representative Robert G. Jaekle, stated: "In law there is a distinction between mere negligence and intentional actions. And in between would be negligence that is just so outrageous that it is wilful, reckless, wanton." 29 H.R. Proc., Pt. 16, 1986 Sess., pp. 5834–35. Representative Jaekle's statement is consistent with the common law. See *Doe* v. *Boy Scouts of America Corp.*, supra, 323 Conn. 330 (recklessness "is more than negligence, more than gross negligence" and "[w]anton misconduct is reckless misconduct" [internal quotation marks omitted]); *Begley*

v. *Kohl & Madden Printing Ink Co.*, 157 Conn. 445, 450, 254 A.2d 907 (1969) ("[t]here is a wide difference between negligence and a reckless disregard of the rights or safety of others" [internal quotation marks omitted]).

Indeed, under the common law, recklessness is typically defined in relation to negligence, distinguished from the latter by degree and by mental state. "Recklessness requires a conscious choice of a course of action either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man, and the actor must recognize that his conduct involves a risk substantially greater . . . than that which is necessary to make his conduct negligent. . . . [W]e have described recklessness as a state of consciousness with reference to the consequences of one's acts. . . . The state of mind amounting to recklessness may be inferred from conduct. But, in order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them. . . . It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action." (Internal quotation marks omitted.) *Doe* v. *Boy Scouts of America Corp.*, supra, 323 Conn. 330. "[R]eckless conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." (Internal quotation marks omitted.) *Matthiessen* v. *Vanech*, 266 Conn. 822, 833, 836 A.2d 394 (2003).

The key distinctions between negligence and recklessness, then, are the extreme departure from ordinary care and the conscious choice of this course of action with knowledge of the serious risk of harm involved. See 2 Restatement (Second), Torts § 500, comment (g), p. 590 (1965). With respect to the magnitude of risk, the Restatement (Second) explains: "The difference between reckless misconduct and conduct involving only such a quantum of risk as is necessary to make it negligent is a difference in the degree of the risk, *but this difference of degree is so marked as to amount substantially to a difference in kind.*" (Emphasis added.) Id.

Typically, recklessness has been cast in terms of requiring a high probability of a serious harm. See, e.g., *Doe* v. *Boy Scouts of America Corp.*, supra, 323 Conn. 330 (serious danger and risk substantially greater than negligence); *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 382, 119 A.3d 462 (2015) (same); *Matthiessen* v. *Vanech*, supra, 266 Conn. 832–33 (same); *Frillici* v. *Westport*, 264 Conn. 266, 277–78, 823 A.2d 1172 (2003) (same); *Craig* v. *Driscoll*, 262 Conn. 312, 342–43, 813 A.2d 1003 (2003) (same); *Brock* v. *Waldron*,

127 Conn. 79, 84, 14 A.2d 713 (1940) ("high degree of probability that substantial harm will result" [internal quotation marks omitted]).

Although this court has not previously considered recklessness in the context of a violation of a statute, the Restatement (Second) of Torts and its predecessor similarly have indicated that a high probability of serious harm would be required to establish recklessness in this context. See 2 Restatement (Second), supra, comment (e), p. 589 ("[i]n order that the breach of the statute constitute reckless disregard for the safety of those for whose protection it is enacted, the statute must not only be intentionally violated, but the precautions required must be such that their omission will be recognized as involving a high degree of probability that serious harm will result"); 2 Restatement (First), Torts § 500, comment (e), p. 1295 (1934) (substantially same language). In applying this standard, courts have looked not only to the general risk associated with a violation of the statute, but also to facts known to the actor that would make the actor aware of an increased risk of harm under the specific circumstances that gave rise to the plaintiff's injury. See, e.g., *Boyd* v. *National Railroad Passenger Corp.*, 446 Mass. 540, 552-53, 845 N.E.2d 356 (2006) (applying Restatement [Second] definition of recklessness and concluding that there was genuine issue of material fact whether failure of train operator to blow horn at crossing and obey speed limit, as mandated by statute, was reckless because train operator knew that individuals had been crossing specific tracks where injuries occurred and death was near certainty to result should accident occur).

Other sources have, as the majority has indicated, collectively characterized the likelihood and gravity of harm, using terms such as "great danger," which leave open the possibility that it may be reckless to disregard a less probable risk of grave injury. See 1 Restatement (Third), Torts, Liability for Physical and Emotional Harm, § 2, comment (d), p. 20 (2010) ("[t]he 'magnitude' of the risk includes both the likelihood of a harm-causing incident and the severity of the harm that may ensue"); W. Keeton et al., Prosser and Keaton on the Law of Torts (5th Ed. 1984) § 34, p. 214 (reckless conduct must be more than "even . . . an intentional omission to perform a statutory duty, except in those cases where a reasonable person in the actor's place would have been aware of great danger, and proceeding in the face of it is so entirely unreasonable as to amount to aggravated negligence" [footnote omitted]); see also *Frillici* v. *Westport*, supra, 264 Conn. 278 ("extreme departure from ordinary care . . . in a situation where a *high degree of danger* is apparent" [emphasis added; internal quotation marks omitted]). Consistent with this view, the Restatement (Third) of Torts no longer distinguishes a violation of a statute as a specific circumstance under which recklessness requires a high

probability of serious harm. See 1 Restatement (Third), supra, § 2.

Nothing in these authorities, however, can be read to abandon the fundamental principle that more egregious conduct is required to distinguish reckless disregard from negligence. A contrary conclusion would effectively result in negligence per se for any violation of a statute intended to safeguard against the possibility of grave harm.[6]

Accordingly, it is important to point out that we have recognized that the failure to protect against a low probability of grave harm may constitute *negligence*, as long as the burden of prevention is not substantial in relation to that risk. See *Munn* v. *Hotchkiss School*, 326 Conn. 540, 568, 165 A.3d 1167 (2017) ("Although . . . tick-borne encephalitis is not a widespread illness, when it strikes, the results can be devastating. At the same time, some of the measures one might take to protect against it are simple and straightforward . . . .").[7] This balancing test has a long and venerable history. See id., 568–69 ("The case thus brings to mind the risk-benefit calculus articulated long ago by Judge Learned Hand to determine whether, in given circumstances, reasonable care has been exercised. Pursuant to that formulation, both the likelihood and the gravity of potential harm should be taken into consideration, as well as the burden of taking adequate precautions to prevent that harm from occurring. See *United States* v. *Carroll Towing Co.*, 159 F.2d 169, 173 [2d Cir. 1947]. In short, '[g]iven a balancing approach to negligence, even if the likelihood of harm stemming from the actor's conduct is small, the actor can be negligent if the severity of the possible harm is great and the burden of precautions is limited.' 1 Restatement [Third], supra, § 3, comment (f), p. 31; see also 3 F. Harper et al., Harper, James & Grey on Torts [3d Ed. 2007] § 16.9 [2], p. 523 ['[i]f the harm that may be foreseen is great, conduct that threatens it may be negligent even though the statistical probability of its happening is very slight indeed']; 3 F. Harper et al., supra, § 16.9 [3], p. 528 ['the law imposes liability for failure to take precautions, even against remote risks, if the cost of the precautions would be relatively low']." [Emphasis omitted.]).

Because the deviation from the standard of care distinguishing negligence from recklessness is, in part, a matter of degree, it follows that a low risk of grave harm theoretically could also constitute recklessness. To constitute the requisite extreme departure from ordinary care, however, the imbalance between the magnitude of the danger and the burden of prevention would have to be significantly greater than the imbalance that gives rise to a duty of care for negligence. Although this court has not adopted the Restatement (Third) definition of recklessness,[8] it is nonetheless instructive on this point: "A person acts recklessly in engaging in

conduct if . . . the person knows of the risk of harm created by the conduct or knows facts that make the risk obvious to another in the person's situation, and . . . the precaution that would eliminate or reduce the risk involves burdens that are so slight relative to the magnitude of the risk as to render the person's failure to adopt the precaution a demonstration of the person's indifference to the risk." 1 Restatement (Third), supra, § 2, pp. 16–17. The comments to this section elaborate on this balancing. "The 'magnitude' of the risk includes both the likelihood of a harm-causing incident and the severity of the harm that may ensue. . . . When . . . the imbalance between the magnitude of the foreseeable risk and the burden of precaution becomes sufficiently large, that imbalance indicates that the actor's conduct is substantially worse than ordinary negligence." Id., comment (d), pp. 20–21. "In most cases, a finding of recklessness is not appropriate unless the prospect of injury is especially high; but a requirement that harm be 'probable' should not be a rigid prerequisite for a finding of recklessness.§ Id., comment (e), p. 21.

When, as here, the preventative act is mandated by statute, that mandate is evidence that the legislature viewed the burden of performing the mandated act as proportionately less than the general risk of harm it was intended to protect against. Nonetheless, such evidence does not conclusively establish that failure to assume that burden was the extreme departure from ordinary care necessary to render that failure reckless rather than merely negligent. *Matthiessen* v. *Vanech*, supra, 266 Conn. 833–34. To hold otherwise would replace the standard for recklessness with one of negligence per se whenever there is a knowing departure from the statutory mandate to inspect. Thus, a plaintiff must plead and prove more than a knowing statutory violation to prevail on a claim of recklessness; the plaintiff must present evidence from which a trier of fact could conclude that the magnitude of the risk of harm arising from the defendant's failure to perform the mandated act was so great in relation to the burden of performing, under the circumstances of the plaintiff's injury, that it constituted an extreme departure from ordinary care when the defendant failed to abide by the statute despite knowing the risk that would result from such failure. Should a defendant present competent evidence to demonstrate that the burden of performing the mandated act was great in relation to the magnitude of the danger the statute was intended to prevent, such evidence necessarily would bear on that question, as such evidence would be relevant to determine whether the failure to perform the duty was a conscious choice to ignore the risk of harm posed by such failure. See 1 Restatement (Third), supra, § 2, comment (d), p. 20. Whether the imbalance between the burden of precaution and the magnitude of the foreseeable risk in a particular case

is sufficiently great to constitute recklessness, rather than ordinary negligence, would generally be a question of fact for the trier. *Brock* v. *Waldron*, supra, 127 Conn. 83.

A comparison of these principles with the majority's opinion reveals several defects in its analysis. First, the majority fails to sufficiently distinguish reckless disregard from negligence. The majority agrees with the plaintiff that "it may be reckless to disregard a grave risk . . . even if it is relatively uncommon, and also that the risk involved can be a generalized one that is not specific to the premises in question," and further concludes that "a municipal actor may demonstrate reckless disregard for health or safety when it is clear that the failure to inspect may result in a catastrophic harm, albeit not a likely one." Nothing in these statements accounts for the greater magnitude of risk necessary to distinguish recklessness from negligence. Under the majority's articulation of reckless disregard, it would always be reckless to fail to perform a health or safety inspection because such inspections are intended to prevent not only harms of lesser consequence but also grave, but unlikely, harms.

The examples cited by the majority of circumstances under which they claim it would be per se reckless to fail to perform an inspection intended to prevent a grave, but unlikely, harm are materially distinguishable. The failure of safety equipment at a nuclear power plant or on a passenger airplane will *almost certainly* lead to catastrophic loss of human life should conditions trigger the operation of such equipment. Cf. *Boyd* v. *National Railroad Passenger Corp.*, supra, 446 Mass. 552–53 (deeming it significant for purposes of recklessness analysis that, if moving train struck pedestrian at railroad crossing due to failure to obey safety requirements designed to prevent such accidents, catastrophic injury or death would be near certainty). Moreover, should nuclear or aeronautical safeguards fail, there would be no means to protect oneself from the harm. In contrast, although the failure of fire safety measures could potentially result in catastrophic harm, in many cases far less serious harm will result and other means may exist to protect oneself from the harm. For example, a fire may occur when a building is unoccupied, with damage to property only. A building without functioning smoke detectors may be occupied but the resident may discover and extinguish the fire, or escape the fire, before the resident is seriously harmed. Thus, even accepting the majority's proposition that the failure to conduct certain kinds of safety inspections could be per se reckless—a proposition for which it cites no authority—the failure to conduct a fire safety code inspection is not on par with those circumstances.

Second, rather than requiring the jury to balance the magnitude of the danger against the burden of inspec-

tion, the majority relegates the burden of inspection to an optional consideration, one factor among many that a jury may consider in determining whether failure to inspect was in reckless disregard of health or safety under all the relevant circumstances. Even under a negligence standard, failure to inspect would only be negligent if the burden to inspect was less than the magnitude of the danger. See *Munn* v. *Hotchkiss School*, supra, 326 Conn. 568 (no requirement to take every measure to prevent harm, jury could have found several simple measures to be sufficient); see also *Considine* v. *Waterbury*, 279 Conn. 830, 868 n.20, 905 A.2d 70 (2006). For conduct, including a failure to inspect, to be reckless, the departure from ordinary care must be extreme. *Matthiessen* v. *Vanech*, supra, 266 Conn. 833–34. Evidence of the burden of inspection would be essential to the jury's determination of whether the defendant's failure to inspect constituted such an extreme departure and reflected a conscious choice to ignore the risk of harm arising from failure to inspect. By failing to require a balancing of the likelihood and degree of harm that may arise from failure to perform a fire safety code inspection against the burden of performing such inspection, the majority effectively imposes a lesser standard than that which would be required to establish negligence.[9]

Having explained why the majority's interpretation of "reckless disregard" falls short of the mark, I turn to my concerns with the majority's analysis of that phrase as it relates to "under all the relevant circumstances." As previously indicated, § 52-557n (b) (8) sets forth two circumstances under which a failure to inspect could give rise to municipal liability: notice of a violation of law or hazard, or reckless disregard under all the relevant circumstances.

The majority concludes that the statute's inclusion of the modifying phrase "under *all* the relevant circumstances"; (emphasis added); suggests that we are to view the exception through a broad lens. The majority then hypothesizes a host of relevant circumstances, principally focused on the inspection duty itself—whether it is mandated, the nature of harm that it is intended to prevent, how frequently it is to be conducted, etc.—and the execution of that duty generally. There are at least three problems with the majority's construction.

First, the majority applies a broad lens when we are bound by a rule of strict construction. See *Ugrin* v. *Cheshire*, supra, 307 Conn. 382, 384; *Martel* v. *Metropolitan District Commission*, supra, 275 Conn. 57–58. The word "all" is not clear evidence to the contrary, as it logically does not expand the scope of the statutory waiver. Although we generally do not read a statute to render a word superfluous; *Lopa* v. *Brinker International, Inc.*, 296 Conn. 426, 433, 994 A.2d 1265 (2010);

the statute's meaning would be the same without it. Any circumstance that is "relevant" to reckless disregard of health or safety must be considered.

Second, the majority fails to consider evidence that the requisite relevant circumstances for reckless disregard, like the actual notice prong, are those circumstances that increase the risk to health or safety at the subject premises. It cannot reasonably be disputed that the actual notice prong is directed at conditions existing at the subject premises, despite no express reference to such premises. Construing the reckless disregard prong similarly renders the two prongs more internally consistent. See *Indian Spring Land Co.* v. *Inland Wetlands & Watercourses Agency*, 322 Conn. 1, 18, 145 A.3d 851 (2016) (noting preference for construction that renders statute internally consistent). Such parity of construction also adheres more consistently to the two prongs of common-law recklessness, which require either knowledge of the risk that manifested or knowledge of facts that would give notice of such a risk. See 2 Restatement (Second), supra, § 500. To the extent that the majority appears to assume that such a construction would conflate the reckless disregard prong of § 52-557n (b) (8) with the notice of a violation of law or hazard prong of the statute, that is clearly not the case. Examples of circumstances that would not require notice of a violation or hazard but would be relevant to reckless disregard might include a defendant's knowledge of a history of code violations in the subject property or in properties owned or managed by the same person(s) that own or manage the subject property, a building's design or materials that could exacerbate the risk of harm should a fire occur or increase the risk of a fire, or conditions that would make it more difficult for firefighters to respond to a fire at the subject premises.[10] Certainly, facts relating to circumstances beyond the subject premises may be relevant to a defendant's knowledge of the risk from failure to inspect, the burden of inspecting the subject premises, and, thus, whether the failure to inspect was the result of the defendant's conscious choice to disregard the magnitude of the risk of harm arising from failure to inspect the subject premises. Yet these facts are only relevant because they illuminate the defendant's actions in relation to the risk of harm from failure to inspect the subject premises.

Third, in addition to ignoring the relevant circumstances most consistent with the statute and the definition of recklessness, the majority's focus on the general duty to inspect has other shortcomings. The majority hypothesizes that "when the failure to inspect is not an isolated incident but results from a general policy of not conducting inspections of a certain type, the jury reasonably may consider whether the policy itself indicates a reckless disregard for public health or safety." In the discussion that follows, the majority appears to

effectively equate the known failure to inspect certain premises with a general policy of not performing those inspections. As a legal matter, this standard either improperly ignores the requirement that there must be knowledge of facts relating to the risk for there to be reckless disregard or improperly suggests that mere knowledge of nonperformance of inspection evidences such recklessness. As a factual matter, as explained in part II of this dissenting opinion, a failure to inspect may not have resulted from a decision not to inspect or a decision to ignore the risk of not inspecting. Even if a municipality has decided not to inspect a broad range of premises, such a decision may not be based on a "general policy," but different circumstances particular to subsets of the broad class. Thus, any aggregation of inspection practices, or aggregation of risks and burdens attendant to the failure to conduct mandatory inspections, should be based on proof of an actual "policy" of noninspection, as well as sufficiently similar conditions to the subject premises to establish a related class.

In sum, the majority's construction of the reckless disregard prong of § 52-557n (b) (8) is fatally flawed in numerous respects. Instead of the majority's approach, I would construe the statute to mean that the failure to perform a mandatory fire safety code inspection is in reckless disregard of health or safety when the municipal actor consciously chooses to ignore the risk of serious harm from failing to perform the inspection, as evidenced by an extreme imbalance between the magnitude of the danger and the burden of performing the inspection under all the relevant circumstances. Where the likelihood of a grave harm is low, the burden of inspection must be slight in comparison to establish a conscious disregard of health or safety. The circumstances relevant to conscious disregard focus on those facts known to the municipal actor that establish a greater likelihood or severity of harm at the subject premises of the type that the inspection is generally intended to protect against.

II

Having elaborated on the proper legal standard, I turn to the question of whether the municipal defendants proved that there was no material issue of fact as to whether the plaintiff could meet this standard. I first explain how the majority improperly analyzes this question under a theory of the case that the plaintiff never advanced and that the evidence does not support. I then explain why, in light of the plaintiff's actual theories and the evidence, the municipal defendants were entitled to summary judgment.

In resolving that inquiry to the contrary, the majority determines that the plaintiff proffered evidence to create a material issue of fact as to whether the municipal defendants had a policy not to conduct any of the statu-

torily mandated fire safety code inspections of residences for three or more families, or a policy not to inspect public housing. However, any fair reading of the operative (fourth amended) complaint, the plaintiff's opposition to the motion for summary judgment, her supplemental opposition, the trial court's decision on the motion, the plaintiff's motion for reconsideration of that decision, the plaintiff's briefs to the Appellate Court, and the Appellate Court's decision manifestly demonstrates that the plaintiff advanced no such theory.[11] With respect to the duty to inspect, all of these documents clearly reflect that the plaintiff advanced two, and only two, theories: the municipal defendants either knew of fire safety code violations or hazards in the subject premises or they had recklessly disregarded a risk to health and safety from such violations or hazards by failing to conduct "any" inspection of the premises despite a known, statutory duty to do so annually.[12] The plaintiff's motion for reconsideration, the only submission to the trial court that made any reference to the municipal defendants' conduct regarding citywide inspections, used that evidence to demonstrate the municipal defendants' knowledge of their duty to inspect the subject premises.[13]

The plaintiff's focus on the subject premises with regard to the duty to inspect was not inadvertent, as she clearly was aware of the distinction between a theory specific to the subject premises and one generally applicable to citywide practices and policies. Although fifteen of the plaintiff's seventeen allegations of wrongful conduct against the municipal defendants were specific to the subject premises, including failure to inspect, two allegations were made with regard to citywide practices—failure to provide fire safety training for all of the city of Bridgeport's residents (including the decedents) and failure to formulate fire safety plans for all residents. The municipal defendants proffered evidence to disprove those two general theories, the plaintiff offered none to rebut that evidence, and the trial court's conclusions as to those allegations are not before us.[14] It is unsurprising, therefore, that the municipal defendants did not submit any evidence regarding citywide inspection practices in support of their motion for summary judgment, and that neither the trial court nor the Appellate Court discussed such a theory in their respective decisions.

It is true that city inspection practices were the subject of one of several lines of inquiry in a deposition submitted to the trial court in support of the plaintiff's motion for reconsideration of the decision granting summary judgment. The majority relies heavily on this deposition of Fire Chief Brian Rooney. However, almost all of the testimony cited by the majority is absent from any of the plaintiff's submissions to any court, including ours, and the lone exception cited in those submissions was not cited for the theory advanced by the majority.

See footnote 13 of this dissenting opinion. Although the municipal defendants' counsel conceded at oral argument before this court that we are not limited to consideration of the portions of the deposition cited by the plaintiff in her motion for reconsideration, it is manifestly clear that this concession was made in connection with any such evidence that was related to the plaintiff's theory of the case on which the municipal defendants had sought summary judgment.

I am unaware of any authority that would allow a reviewing court to rely on such evidence to craft a theory of liability that the plaintiff never advanced in any submission to the court.[15] On the contrary, "[t]he pleadings determine which facts are relevant and frame the issues for summary judgment proceedings or for trial. . . . The principle that a plaintiff may rely only [on] what he has alleged is basic. . . . It is fundamental in our law that the right of a plaintiff to recover is limited to the allegations [in] his complaint." (Citations omitted; internal quotation marks omitted.) *White* v. *Mazda Motor of America, Inc.*, 313 Conn. 610, 621, 99 A.3d 1079 (2014). "[A] court's ability to review the evidence, in order to determine whether a genuine issue of fact exists, is not limited to the pleadings. As our law makes clear, however, a plaintiff's theories of liability, and the issues to be tried, are limited to the allegations [in the] complaint." (Internal quotation marks omitted.) Id., 622 n.5; id. (rejecting dissent's assertion in *White* that court may look beyond pleadings to evidence submitted in opposition to summary judgment for theories of liability not pleaded). The majority's attempt to distinguish *White* from the present case is unconvincing because here the plaintiff has *never* advanced the theory of liability advanced by the majority in any court. The majority's reliance on an objection to an interrogatory and a phrase and a citation taken out of context from the trial court's memorandum of decision granting summary judgment are not compelling evidence to the contrary.

Moreover, the majority's emphasis on Rooney's statements regarding his lack of knowledge about fire inspection techniques, equipment, and procedures, as evidence of the municipal defendants' reckless disregard, demonstrates its fundamental misapprehension regarding the distinct roles and responsibilities of a municipal fire chief and a municipal fire marshal. The majority apparently assumes that Rooney, as fire chief, was the supervisor of the fire marshal, and charged with the knowledge of a fire marshal, and, therefore, his understanding of the fire safety code and how it relates to the subject premises can be imputed to the fire marshal. The majority apparently is unaware that, in accordance with long established law, Rooney, as fire chief, had no statutory authority, much less a *duty*, to conduct any fire inspections. Instead, that distinct statutory duty rests solely with the fire marshal and

specially trained fire inspectors under the marshal's direction and control. See General Statutes § 29-305. Moreover, a municipal fire chief does not have the authority to appoint the local fire marshal, to establish the qualifications of the individual appointed as fire marshal, to determine whether the fire marshal can be certified to meet those qualifications, to investigate the fire marshal for negligent or incompetent performance of his duties, or dismiss the fire marshal from his position.[16] Such authority rests squarely with the state fire marshal and/or the state's Codes and Standards Committee; see General Statutes § 29-251; and, although the authority to appoint or terminate a local fire marshal may be delegated by the state fire marshal to a municipality, that does not mean that the municipal fire chief has that authority. See General Statutes §§ 29-297, 29-298, 29-298b, and 29-299.

Indeed, in its decision on both the municipal defendants' motion to strike and motion for summary judgment, the trial court recognized that the duty to conduct fire safety code inspections under § 29-305 is applicable only to local fire marshals, and, as a consequence, was inapplicable to Rooney. The court denied the motion to strike count three, which was the sole count brought against Rooney, only because that count also was brought against the fire marshal and thus was legally sufficient on that basis.[17]

Putting aside the aforementioned colossal impediments, the evidence submitted to the trial court in connection with the motion for summary judgment and the motion for reconsideration does not support the majority's newly minted theory that the municipal defendants had a "policy" of not inspecting any residences occupied by three of more families prior to the 2009 fire. The evidence also does not establish, or even leave open the possibility, that the municipal defendants conducted no such inspections and deliberately chose not to do so. Rather, uncontroverted evidence established that the municipal defendants principally conducted inspections of properties against which complaints had been lodged, and, after a 2005 fire, they assigned streets with clusters of multifamily residences to fire inspectors to inspect; they terminated several such fire inspectors, prior to the 2009 subject fire, for failing to adequately perform their inspection duties. Although there is some evidence that, prior to 2009, the fire marshal was not routinely conducting inspections of all public housing units, the housing authority was conducting some form of inspection at that time and the fire marshal was conducting inspections of public housing units if there had been a complaint. Therefore, the evidence does not support the existence of a policy of not performing any inspections of public housing units either.[18] Thus, there is simply no basis to conclude that the plaintiff sufficiently rebutted the municipal defendants' evidence to defeat their motion for sum-

mary judgment on the basis of any general policy of non-inspection.

Therefore, I turn to the theories that the plaintiff did advance. Insofar as the plaintiff alleged that the municipal defendants knew about fire safety code violations in the subject apartment and building, the municipal defendants proffered affidavits from Fire Marshal William Cosgrove and Rooney, attesting that they had no such notice. The plaintiff did not proffer evidence in rebuttal. Consequently, the Appellate Court concluded that she had abandoned that theory on appeal. See *Williams* v. *Housing Authority*, supra, 159 Conn. App. 691 n.11. Insofar as the plaintiff alleged that the municipal defendants had a duty to inspect the subject premises and knew that they personally had not fulfilled that duty, the municipal defendants effectively conceded those facts to be true in arguments on the plaintiff's motion for reconsideration. However, such a theory is not a legally sufficient basis to establish that the municipal defendants acted in reckless disregard of health and safety, even if conditions in the premises did not conform to the fire safety code, a fact on which there was conflicting evidence. The plaintiff has advanced no theory and presented no evidence that establishes that the risk of harm arising from failure to inspect the subject premises was any greater than the risk of harm arising from failure to inspect any other premises in the city.[19] See *Boyd* v. *National Railroad Passenger Corp.*, supra, 446 Mass. 552–53 (even when accident resulting from violation of statute would be almost certain to cause grave harm in unlikely event of accident, facts known to actor that increased likelihood of harm at particular location critical to issue of recklessness). If a municipal actor's mere awareness of the statute mandating inspection and knowing failure to make any inspection were sufficient to constitute reckless disregard under § 52-557n (b) (8), then any failure to inspect would be considered reckless, and the alternative actual notice prong would be superfluous. More significantly, such a result would effectively render the exclusion from liability for negligent failure to inspect illusory. The standard under such a theory would be no different than the "possible impact" standard that both the majority and I have deemed improper. Therefore, under the only theory that the plaintiff did advance, she failed to establish a genuine issue of material fact whether failure to inspect the subject premises was in reckless disregard of health or safety.

Accordingly, the trial court properly concluded that the municipal defendants were shielded from liability under § 52-557n (b) (8) for failure to inspect the subject premises. Therefore, I disagree with the majority and conclude that the Appellate Court improperly reversed the judgment of the trial court on this ground. Because the Appellate Court also concluded that the trial court's

grant of summary judgment in the municipal defendants' favor as to the plaintiff's allegations regarding certain discretionary acts was improper; see *Williams* v. *Housing Authority*, supra, 159 Conn. App. 702–707; a matter that is not before us in this certified appeal, I would reverse in part the judgment of the Appellate Court as to the certified issue, but affirm the judgment of the Appellate Court insofar as it relates to the identifiable victim/imminent harm exception to discretionary act immunity.

I respectfully dissent.

[1] More specifically, the majority characterizes the evidence as sufficient to establish "the municipal defendants' long-standing policy of not inspecting any of Bridgeport's public or three-family housing facilities for fire risks and not educating themselves as to the adequacy of the housing authority's own internal inspections . . . ."

[2] The plaintiff brought the present action against the following municipal defendants: the City of Bridgeport Fire Department, and five Bridgeport city officials: Fire Chief Brian Rooney, Fire Marshal William Cosgrove, Mayor William Finch, Zoning Administrator Dennis Buckley, and Building Official Peter Paajanen. The plaintiff also named several nonmunicipal defendants in the complaint, who are not parties to the present appeal.

[3] The legislature also has determined that "[a]ny officer of a local fire marshal's office, if acting without malice and in good faith, shall be free from all liability for any action or omission in the performance of his or her official duties." General Statutes § 29-298 (c).

[4] I note that there is a textual argument supporting this conclusion that is not advanced by the majority. In my view, it is significant that § 52-557 (b) (8) provides two circumstances under which liability can arise from a municipality's failure to conduct a mandated inspection. The first of these— notice of a violation of law or a hazard—plainly does not require the plaintiff to establish that the violation or hazard creates a high probability of a risk of harm, let alone, a serious harm. Therefore, I see no reason why we are compelled to conclude that the circumstance of reckless disregard should not be read to impose a comparable standard of proof.

[5] The majority asserts that a lower standard of recklessness than under the common law is supported by certain legislators' statements to the effect that whether negligent conduct rises to the requisite level of recklessness is an issue of fact left to the trier of fact. Although such a statement is undoubtedly true as a general matter, it does not clarify what standard the trier of fact would apply to determine whether the facts establish that the municipal actor's failure to inspect was in reckless disregard of health or safety. Further, an element of proof that is ordinarily a question of fact becomes a question of law when a fair and reasonable person could reach but one conclusion. *Heisinger* v. *Cleary*, 323 Conn. 765, 781 n.18, 150 A.3d 1136 (2016).

[6] A similar untenable result flows from the distinction drawn by the Appellate Court between the two exceptions to immunity under § 52-557n (b) (8), one requiring awareness of a defect and the other requiring awareness of a *duty*. *Williams* v. *Housing Authority*, supra, 159 Conn. App. 694 n.13. If all that recklessness required was knowledge of a statutory duty then recklessness would be synonymous with negligence per se. As I explain later in this dissenting opinion, the reckless disregard exception to immunity can be distinguished from the actual notice exception in that the former involves awareness of a *substantial risk*.

[7] Specifically, "[a]s a result of contracting tick-borne encephalitis, the plaintiff suffered permanent brain damage that has impacted severely the course of her life." *Munn* v. *Hotchkiss School*, supra, 326 Conn. 544.

[8] The majority describes the balancing approach of the Restatement (Third) as a "novel" approach to recklessness. On the contrary, the Restatement (Third) makes explicit what was previously implied in the Restatement (Second); see J. Henderson & A. Twerski, "Intent and Recklessness in Tort: The Practical Craft of Restating Law," 54 Vand. L. Rev. 1133, 1151–52 (2001); is simply a "shift of focus"; id., 1156; and does not represent a departure from the established common law. I agree with the majority that where there is a *high probability* of a grave harm it may be so obvious that the risk of harm far outweighs the burden of prevention that it is

unnecessary to articulate the balancing of those two considerations. But where, as here, there is an *unlikely* risk of grave harm, it cannot be said that an actor was indifferent to a risk unless he was aware of the relative ease of preventing the risk from materializing. Id., 1155–56 ("even a relatively smallish risk that materializes in harm can support a finding of recklessness if the actor knows that the risk can be eliminated at much less cost and goes ahead and acts with conscious indifference to the risk being thereby gratuitously created").

[9] In this context, the burden may best be understood as "[t]he interest that must be sacrificed to avoid the risk." 3 F. Harper et al., supra, § 16.9 (3), p. 524. Further, evidence of the ability of other municipalities to perform similar inspections would not preclude a finder of fact from concluding that the municipal defendants were not reckless in failing to do the same. Id., § 16.9 (3), p. 533 ("[t]he same risk, furthermore, may be avoidable at different sacrifices or other costs by different actors, and the reasonableness or unreasonableness of a failure to avoid that risk may vary correspondingly among the actors"). The majority equates a policy of not inspecting with a purpose of saving resources and suggests that a trier of fact could weigh that policy against the aggregate risks of failing to inspect premises subject to the policy. This reasoning misses the mark on several fronts. A policy of not inspecting certain types of premises may not be motivated in any way, or even primarily, by monetary considerations. The balancing test does not weigh the decision not to inspect against the magnitude of the risk; it weighs the burden of performing inspections of the premises subject to the policy against the magnitude of the risk of not performing that duty. See 1 Restatement (Third), supra, § 2.

[10] A recent tragic fire provides examples of many of these circumstances. On June 14, 2017, a fire engulfed Grenfell Tower, a west London residential tower block, resulting in an estimated eighty deaths, numerous injuries, and the destruction of more than 150 residences. See BBC News, "London Fire: What Happened at Grenfell Tower?" (July 19, 2017), available at http://www.bbc.com/news/uk-england-london-40272168 (last visited December 7, 2017). Firefighters had equipment that only was able to reach the twelfth floor of the twenty-four story tower. Id. Although the fire is still under investigation, initial reports indicate that flammable cladding used on the building during a recent renovation led to the rapid spread of the fire. Id. Fire crews noted that low water pressure, radio problems, and equipment issues also hampered fire suppression efforts. Id. Prior to the fire, there also had been complaints that access to the site for emergency vehicles was " 'severely restricted.' " Id. All of these conditions, if known to the defendants, would be relevant to the magnitude of the danger arising from a failure to perform fire safety inspections.

[11] Although the municipal defendants did not file a special defense of governmental immunity, the plaintiff had ample notice that the municipal defendants were asserting such a claim prior to their motion for summary judgment. The municipal defendants twice moved to strike the counts against them on the basis of governmental immunity. As it relates to the issue before this court, in their second motion to strike, the municipal defendants argued that the plaintiff had failed to sufficiently plead recklessness because she had failed to allege that "the defendants were aware of a substantially greater risk with respect to this specific situation." In response, the plaintiff argued that she had sufficiently pleaded recklessness because she had alleged "that the municipal defendants KNEW that policies and/or laws were violated and/or knew hazards to the health and safety of the decedents existed which violations and/or hazards were causative factors in the deaths of the decedents."

[12] With regard to the second theory, any reasonable contextual reading of the plaintiff's comments emphasizing the municipal defendants' failure to conduct "any" inspections yields the conclusion that the plaintiff was referring to their failure to conduct any sort of inspection at the subject premises or any of the requisite annual inspections at the premises over a period of time. The plaintiff's brief to this court likewise focuses exclusively on the municipal defendants' failure to inspect the premises at issue.

[13] In her motion for reconsideration to the trial court, in connection with her argument that the evidence established that the municipal defendants had a duty to inspect the subject premises and had not done so, the plaintiff repeatedly referred to the their obligations with regard to "the apartment," "that apartment," "the premises where the fire occurred," "the apartment or the building where the fire occurred," "the apartment where the fire occurred," and "the P.T. Barnum Apartment Building #12, Apartment 205."

To make her case that the municipal defendants knew that they had not complied with this obligation, the plaintiff asserted in the penultimate sentence before her request for relief: "Finally, Fire Chief Rooney admitted in his deposition that he was aware the city of Bridgeport did not conduct inspections of three family residences (*which would include the premises which are the subject of the fire in the instance case*) because of a claimed lack of resources." (Emphasis added.) In other words, the plaintiff asserted that, because Rooney was aware of his obligation to inspect three family residences, he necessarily was aware of the duty to inspect the subject premises and the city's failure to fulfill that duty. I do not read the plaintiff's motion for reconsideration to argue that Rooney admitted that the city had conducted *no* inspection of *any* three family houses, in part because, as I explain later in this dissenting opinion, I presume that the plaintiff was aware that his testimony was to the contrary.

Insofar as the plaintiff cited (for the first time in her brief to this court) Rooney's deposition admissions regarding the fatal 2005 Iranistan Avenue fire, she did so to demonstrate that the city "was aware of the substantial risk to public safety by consciously failing to conduct mandatory fire inspections of residences as required by statute."

None of the plaintiff's submissions to any court, ours included, advanced the majority's additional theory that the municipal defendants demonstrated reckless disregard by "not educating themselves as to the adequacy of the housing authority's own internal inspections . . . ."

[14] To the extent that the plaintiff, for the first time, included in her brief to the Appellate Court cases addressing the effect of a municipality's failure to enact policies and procedures that allegedly could have prevented the harm, these cases were in support of the allegations related to such policies and her theory of negligence. At no time did she connect these cases with the allegation of the failure to inspect. The absence of those cases from her brief to this court, in which neither her allegations of negligence nor allegations of deficiencies regarding citywide training of residents and development of safety plans are at issue, demonstrates the purpose of those cases.

[15] The majority's reliance on the deposition raises an additional concern. The plaintiff deposed Rooney after the motion for summary judgment had been submitted to the trial court for a decision. Only after the trial court granted the municipal defendants' motion for summary judgment did the plaintiff submit Rooney's deposition to the trial court, in support of her motion for reconsideration. In order, however, for the trial court to have considered new evidence, the plaintiff would have had to move to open the evidence and then seek reconsideration after the evidence had been opened, each a matter subject to its own burden of proof. The trial court conducted a hearing on that motion, at which time the parties argued both about whether it was proper for the trial court to consider the deposition and about the merits of the motion in relation to the deposition evidence. The trial court summarily denied the motion, instead of granting the motion and denying the relief sought, which would imply that the trial court did not reach the merits. The trial court's summary order gave no indication of whether it had treated the motion to reargue as both a motion to open and a motion to reargue. The plaintiff did not seek articulation of this ruling. Cf. *Mazziotti* v. *Allstate Ins. Co.*, 240 Conn. 799, 810, 695 A.2d 1010 (1997) (where it is unclear on which of several bases trial court decided motion, responsibility of appellant to secure adequate record for review). On appeal, both parties seem to proceed from the assumption that the trial court considered the deposition in making its ruling. Therefore, the majority determines that it properly may rely on this evidence. Nonetheless, it is unclear whether the majority is relying on deposition testimony that was not part of the evidence considered by the trial court in deciding the municipal defendants' motion for summary judgment. Although I find this potential defect troubling, I do not reach this issue because the result would be the same in either case. As I later explain, even if one properly could consider the deposition testimony, which is not at all clear to me, it does not create a genuine issue of material fact based on the theories of liability actually raised by the plaintiff.

[16] In describing the termination of several fire inspectors for failing to conduct inspections prior to 2009, Rooney stated in his deposition that the city had discharged those inspectors. He did not state that he personally discharged them, presumably because he lacked the statutory authority to do so. Rooney also discussed "supervising" the fire marshal division, but principally in connection with administrative tasks, such as preparing budgets, providing information to the division on upcoming events, and meeting

with the division to receive information on the status of inspections and investigations. Significantly, when specifically asked about supervision of the fire marshal division's performance of inspections, Rooney clearly stated that he was neither trained nor tasked with conducting inspections and that he left the work of inspections to the fire marshal and his subordinates. The plaintiff did not plead a theory of liability based upon inadequate supervision of the fire marshal division by Rooney.

[17] The suggestion by the majority and the Appellate Court that the municipal defendants had not distinguished themselves with regard to the allegations is not only belied by the trial court's decisions but also by the municipal defendants' argument in support of their motion for summary judgment in which they asked the court to view the allegations and the record mindful of such distinctions.

[18] Insofar as the majority asserts that the municipal defendants demonstrated a reckless disregard by "not educating themselves as to the adequacy of the housing authority's own internal inspections," the plaintiff never raised this claim and, even if she had, the plaintiff failed to provide evidence that would support a conclusion that delegation of the duty to inspect public housing, including the decedents' apartment, to the housing authority created such a magnitude of danger that it was in reckless disregard of health or safety.

[19] To the extent that the majority relies on the 2005 Iranistan Avenue fire to create a genuine issue of material fact whether the municipal defendants had notice of an elevated risk from failure to inspect the subject premises, such reliance is misplaced. The circumstances are materially different. The Iranistan Avenue fire involved a private multifamily residence whereas the subject fire involved a public housing unit. Rooney testified in his deposition, and the plaintiff presented no evidence to contradict his testimony, that the risk of fire for private multifamily residences is greater than the risk of fire for public housing units because of absentee landlords in the former. More importantly, the defect identified in the Iranistan Avenue fire, namely, the lack of any smoke detectors, was not present in the subject premises. The uncontroverted evidence establishes that housing authority employees inspected and repaired the smoke detectors in the subject premises one day before the fire and that these detectors were functioning at the time of the fire.

---